## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

TAVARREON DICKERSON,       )
                    )
      **Petitioner,**      )
                    )
**v.**                  )      **Case No. 22-CV-0074-GKF-SH**
                    )
**MICHAEL MILLER, Warden,**[1]  )
                    )
      **Respondent.**    )

## OPINION AND ORDER

Petitioner Tavarreon Dickerson is serving a life sentence under the judgment that was entered against him, in Tulsa County District Court Case No. CF-2016-2342, after a jury convicted him of child abuse murder for the death of his six-week-old daughter, R.D. Appearing through counsel, Dickerson petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He contends he is in custody in violation of federal law because: (1) the trial court admitted unduly prejudicial evidence (claim one); (2) the State suppressed exculpatory and impeachment evidence (claims two and six); (3) the prosecutors committed egregious misconduct (claim three); (4) trial and appellate attorneys provided constitutionally deficient representation (claims four and five); and (5) the cumulative effect of errors deprived him of a fundamentally fair trial and appeal (claim seven). Having considered the Petition (Dkt. 2) and Brief in Support (Dkt. 10), the Response (Dkt. 17), the Reply (Dkt. 22), the record of state court proceedings, and applicable law, the Court finds and concludes that the Petition shall be denied.

---

[1] Dickerson presently is incarcerated at the Allen Gamble Correctional Center in Holdenville, Oklahoma. *See* OK Offender Lookup, https://www.okoffender.doc.ok.gov (query ODOC # 783403), last visited Mar. 20, 2025. The Court therefore substitutes the current warden of that facility, Michael Miller, in place of Mark Bowen as party respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

## BACKGROUND

### I.   R.D.

R.D. was born in December 2015 and died when she was six weeks old.  Dkt. 18-11 at 101 [280]; Dkt. 18-13 at 41-42 [480-81].[2]  Before she died, R.D. lived in Tulsa with her father, Dickerson; her mother, Jenna; and two older siblings, four-year-old T.D., and two-year-old K.D.  Dkt. 18-11 at 101-02 [280-81], 106 [285].  In January 2016, Dickerson was attending college, and Jenna had recently returned to work following maternity leave.  Dkt. 18-11 at 104 [283], 114-15 [293-94].  The two had an argument on the Thursday before R.D.'s death after Jenna discovered text messages Dickerson sent to another woman.  *Id.* at 117-32 [296-311].  Jenna and R.D.'s siblings spent Thursday night in Catoosa with Jenna's friend, Sydney, while R.D. stayed home with Dickerson.  *Id.* at 119-22 [298-301]; Dkt. 18-13 at 153 [592], 168 [607].  Jenna left R.D. with Dickerson because Jenna already had R.D.'s siblings with her, she was upset with Dickerson about the text messages she found and did not want to return home, and Dickerson told her that she "didn't have a choice" about taking R.D. with her.  Dkt. 18-11 at 119-20 [298-99], 149-50 [328-29].  Jenna and Sydney picked up R.D. on Friday evening,[3] before Jenna, all three children, Sydney, and Sydney's family attended a basketball game in Catoosa.  Dkt. 18-11 at 123-24 [302-03]; Dkt. 18-13 at 153-54 [592-93], 169-70 [608-09].  According to Jenna, R.D. was fine, had no problems taking her formula, and mostly slept during the basketball game.  Dkt. 18-11 at 123-24 [302-03].  Jenna left all three children with Sydney's mother, Melanie, on Friday night, while

---

[2] The Court's citations refer to the CM/ECF pagination.  When the Court cites to transcripts of state court proceedings, the Court also includes, in brackets, the original pagination if it differs from the CM/ECF pagination.

[3] Jenna testified she took Sydney with her when she picked up R.D. because she did not know how mad Dickerson would be and she wanted to avoid a confrontation with him.  Dkt. 18-11 at 151-53 [330-32].

Jenna and Sydney went to a bar in downtown Tulsa. Dkt. 18-11 at 124-26 [303-05]; Dkt. 18-13 at 154-55 [593-94], 170-71 [609-10]. Melanie noticed that R.D. was fussy, and she assumed that was because Jenna had just changed R.D.'s formula, but Melanie had no concerns with R.D.'s feeding or sleeping patterns that night. Dkt. 18-13 at 155-56 [594-95]. After they left Catoosa, Jenna and Sydney met up with Dickerson at the bar. Dkt. 18-11 at 124-26 [303-05], 185 [364]; Dkt. 18-13 at 171 [610]. Jenna and Sydney stayed at the Dickersons' home on Friday night and returned to Catoosa on Saturday morning. Dkt. 18-11 at 124-27 [303-06]; Dkt. 18-13 at 171-72 [610-11]. Jenna and all three children spent the day in Catoosa with Sydney and Melanie and returned to their home in Tulsa Saturday evening. Dkt. 18-11 at 126-27 [305-06]; Dkt. 18-13 at 156 [595]. According to Jenna, R.D. was fussy and did not sleep well throughout the day on Saturday. Dkt. 18-11 at 181 [360].

When Jenna returned home with all three children, Dickerson had a friend over, and she and Dickerson "really didn't talk." Dkt. 18-11 at 129-33 [308-12]. R.D. was fussy through the evening and night on Saturday. *Id.* at 181-83 [360-62]. Jenna fed R.D. around midnight and again around 3:00 a.m. on Sunday, January 10, 2016. *Id.* at 132-34 [311-13]. R.D. did not finish her bottle during either feeding and R.D. would not go back to sleep after the second feeding. *Id.* Dickerson took R.D. to the living room with him so Jenna could sleep. *Id.* at 134-36 [313-15]; According to Dickerson, R.D. cried for several minutes while he tried to rock her to sleep, R.D. vomited (not like a regular spit-up), gasped for air and burped, and Dickerson noticed that her eyes looked a little different either before or after she fell asleep. Dkt. 19, State's Ex. 3 at 2:30 to 7:30,

State's Ex. 47 at 12:00-15:00.[4]  Dickerson dozed off on the couch with R.D. cradled in his arm. *Id.*  Dickerson woke up thirty minutes to one hour later, got up to place R.D. in her bassinet, and noticed that her head rolled back, she was limp, and she was not breathing; he tried pushing or squeezing on R.D.'s stomach, but R.D. was "white in the face" and nonresponsive.  *Id.*  Dickerson woke Jenna and told her they needed to take R.D. to the hospital.  Dkt. 18-11 at 136-137 [315-16].  Jenna went to the living room, saw R.D. laying on the couch looking pale and "very limp," and called 911.  Dkt. 18-11 at 136-41 [315-20], 189-91 [368-70]; Dkt. 19, State's Ex. 1 (911 call).  Following the 911 operator's instructions, Dickerson and Jenna performed CPR.  *Id.*; Dkt. 18-14 at 1 [631].

Tyler Martin, with the Tulsa Fire Department, arrived before the ambulance.  Dkt. 18-12 at 3-6 [391-94].  Dickerson opened the door for Martin and pointed to the couch where R.D. was laying.  *Id.*  Neither parent was performing CPR when Martin arrived.  *Id.*  Martin observed that R.D. was not breathing and had no pulse, heard the ambulance arrive, and performed chest compressions as he carried R.D. to the ambulance.  *Id.*  Paramedics transported R.D. to the hospital by ambulance and used a bag valve mask to breathe for R.D. but she had no pulse.  Dkt. 18-11 at 207-10 [386-89]; Dkt. 18-12, at 2-7 [390-95], 26-31 [414-19].  When R.D. arrived at the hospital, emergency personnel intubated her, recovered a pulse, and placed her on life support.  Dkt. 18-12 at 30-31 [418-19]; Dkt. 18-15 at 14 [764].  R.D. died on January 13, 2016.  Dkt. 18-13 at 41 [480].

## II.    Investigation

Tulsa Police Officer Ashley Kite arrived at the Dickersons' home shortly after the

---

[4] Dickerson did not testify at trial, but the jury heard statements he made on January 10, 2016, during an audiotaped interview with a detective and social worker at the hospital (State's Ex. 3), and in April 2016, during an audiotaped interview with two detectives (State's Ex. 47). Dkt. 18-13 at 132 [571]; Dkt. 18-14 at 67 [697].

paramedics, noticed an odor of marijuana, spoke with Dickerson, and contacted Detective Mark Sole.  Dkt. 18-13 at 184-91 [623-30]; Dkt. 18-14 at 1-15 [631-48].  Before he left for the hospital, Dickerson told Officer Kite that he had smoked marijuana the prior night and that he had marijuana in a living room cabinet.  Dkt. 18-14 at 2-4 [632-34].  In the cabinet, Officer Kite found marijuana, several glass bongs or smoking pipes, a set of electronic scales, and a jar of marijuana.  *Id.* Detective Sole went to the hospital, spoke with R.D.'s parents, and briefly spoke with medical providers.  Dkt. 18-14 at 9 [639], 13-24 [643-54].  R.D.'s attending physician, Dr. Jaiswal, consulted with Dr. Michael Baxter, a child abuse pediatrician, about the results of R.D.'s CT scan and chest X-ray which revealed, respectively, significant bleeding and swelling in her brain and healing rib fractures that appeared to pre-date the head injuries.  Dkt. 18-14 at 73-83 [703-13]; Dkt. 18-15 at 14-15 [764-65], 36-38 [786-88].  Based on Dr. Baxter's review of R.D.'s medical records, his examination of R.D. before she died, and his conversations with R.D.'s parents— neither of whom could explain R.D.'s injuries—Dr. Baxter suspected child abuse.  Dkt. 18-15 at 14-37 [764-87].

R.D.'s case was assigned to Detective Danielle Bishop, a child crisis unit detective.  *Id.* at 24 [654], 30 [660].  Detective Bishop and Miranda Gutierrez, an investigator with the Oklahoma Department of Human Services, went to the hospital, spoke with medical providers, and interviewed Jenna and Dickerson, separately, on January 10, 2016, the same day R.D. was admitted to the hospital.  Dkt. 18-13 at 116-19 [555-58], 124-29 [563-68].

One day after R.D. died, Dr. Andrea Wiens, a state medical examiner, performed R.D.'s autopsy.  Dkt. 18-13 at 23-24 [462-63], 41 [480]; *see* Dkt. 10-3 (autopsy report).  Dr. Weins determined that R.D. died from "[m]ultiple blunt-impact injuries" and that her manner of death was homicide.  *Id.* at 41 [480], 75 [514]; Dkt. 10-3 at 4.  In April 2016, after receiving the final

autopsy report, Detective Bishop and Detective Matt Snow interviewed Dickerson at his home. Dkt. 18-14 at 40 [670], 55-59 [685-89].  One month later, the State charged Dickerson with child abuse murder, in violation of Okla. Stat. tit. 21, § 701.7.  Dkt. 18-27 at 24; Dkt. 18-36 at 9. After extensive pretrial proceedings, his case was tried to a jury in December 2017.  Dkt. 18-36 at 50.

## III.    Trial

The State, represented by prosecutors Sarah McAmis and Stephanie Jacoby, proceeded on a theory that R.D. died from abusive head trauma ("AHT"), formerly referred to as "shaken baby syndrome," after Dickerson either shook her, hit her head with an object, or hit her head against an object.  Dkt. 18-11 at 76 [255], 91-93 [270-72]; Dkt. 18-15 at 59-60 [809-10].  To support this theory, the State presented testimony from two medical experts:  Andrea Wiens, D.O., a medical examiner board-certified in forensic pathology, anatomic pathology, and neuropathology; and Michael Baxter, D.O., a pediatrician board-certified in general and child abuse pediatrics and the director of Tulsa's Child Advocacy Center.  Dkt. 10-3 at 3; Dkt. 18-13 at 24-27 [463-66]; Dkt. 18-14 at 73-85 [703-15].  In addition, the State presented evidence through Jenna that she and Dickerson argued in the days leading up to R.D.'s death and that Dickerson previously abused Jenna and R.D.'s siblings.

Dickerson, represented by trial attorneys Keith McArtor and Amanda Mims, defended on a theory that R.D. died from a congenital birth defect, specifically, a ruptured vascular malformation ("VM"), commonly referred to as an aneurysm.  *Id.* at 98-99 [277-78]; Dkt. 18-15

at 147-53 [897-903]; Dkt. 18-16 at 5-6 [933-34], 56 [984].[5]  To support this theory, Dickerson

presented one expert witness, Xhongxue Hua, M.D., a medical examiner board-certified in forensic

pathology, anatomic pathology, and neuropathology.  Dkt. 18-15 at 124-28 [874-78].  In addition,

while Dickerson did not testify, he relied in part, on statements he made to other witnesses and

during his audiotaped interviews wherein he repeatedly denied causing R.D.'s injuries.

### A.    State's case-in-chief

#### 1.    Evidence of abusive head trauma

Dr. Wiens, who performed R.D.'s autopsy, examined R.D.'s skull and the underside of her

scalp and found two contusions—one on the left frontal scalp and one on the left occipital bone,

behind the left ear area—that she described as "fresh" and likely caused by a blunt object making

direct contact with R.D.'s skull.  Dkt. 18-13 at 45-48 [484-87], 80-83 [519-22].  Dr. Weins found

no skull fractures and no retinal hemorrhaging; she testified both type of injuries could be present

or absent in cases involving AHT.  *Id.* at 77 [516].  On external examination of R.D.'s brain, Dr.

Weins found a subdural hematoma (bleeding under the dura, "a fibrous layer of tissue that covers

the brain) and a subarachnoid hemorrhage (bleeding under the leptomeninges, a thinner layer of

tissue underneath the dura "right on the surface of the brain");  a hemorrhage in the optic nerve

sheath going to the left eye; swelling in the brain; and anoxic brain injury (death of brain tissue

caused by lack of oxygen).  *Id.* at 48-51 [487-90].  Dr. Weins explained that anoxic brain injury

---

[5] Dr. Hua testified here are different kinds of VMs, and that a type of staining can be performed on microscopic slides to distinguish which is present.  Dkt. 18-16 at 55-56 [983-84]. That staining was not done in this case because Dr. Weins either did not see R.D.'s VM on autopsy or, after it was brought to her attention by Dr. Hua, did not consider the VM relevant to R.D.'s death.  Dkt. 18-13 at 101 [540].  Dr. Hua testified that R.D.'s VM had characteristics of an arteriovenous malformation ("AVM"), which carries "a much, much higher risk of rupture as compared to the other one called telangiectasia, a small collection of single vessel[s]."  Dkt. 18-16 at 56 [984].  Because it is not clear from the trial testimony which kind of VM was present in R.D.'s case, the Court will use the generic "VM" to refer to her vascular malformation.

and swelling "are consequences of blunt impact to the head" because the brain starts to swell within seconds of a severe impact, the swelling cuts off the supply of blood to the brain, and the brain starts to die. *Id.* at 50-51. Dr. Wiens described the subdural hematoma and the subarachnoid hemorrhage as acute and opined that they occurred "less than five days, definitively" and "less than three to four days, probably" before R.D.'s death. *Id.* at 51-52 [490-91]. Dr. Weins also found subacute fractures on two posterior left ribs. *Id.* at 52-53 [491-92]. On microscopic examination of thin slices taken from callous formations on the ribs, Dr. Wiens found evidence of "healing that was somewhere in the two- three- four-week range." *Id.* She testified that "posterior rib fractures, especially in a baby, are highly indicative of inflicted injury." *Id.* at 54 [493]. Dr. Weins also found a subacute hemorrhage in R.D.'s thoracic spinal cord that she opined likely was related to the rib fractures. *Id.* at 55-58 [494-97]. Ultimately, Dr. Weins opined that R.D. died from "[m]ultiple blunt-impact injuries" and that her manner of death was homicide. *Id.* at 41 [480], 75 [514].

Anticipating Dr. Hua's testimony that R.D. died from a ruptured VM, Dr. Weins acknowledged that R.D. had a VM in her brain stem, described it as a "tiny one to two millimeter diameter cluster of vessels" that has the potential to bleed, and testified that she found no microscopic or non-microscopic evidence on autopsy indicating the VM had ruptured.[6] *Id.* at 66-

---

[6] Dr. Weins testified:

I for sure saw [the VM] after I saw [Dr. Hua's] report, I don't remember if I saw it before I saw it [in] his report. And that is because I did not document it in my report. And so that could be one of two things. One, I didn't see it when I first looked at the slide. Or, two, I saw it when I first looked at the slide but I disregarded it as an incidental finding. I mean, it's only one to two millimeters in size, and so I did not include it in my report as being a relevant finding. So it could be either of those and I can't say for sure which one because I don't remember.

Dkt. 18-13 at 101 [540].

67 [505-06], 94 [533], 99-103 [538-42]. Dr. Wiens testified that if the VM had ruptured, the hemorrhage from the ruptured VM would have been visible when Dr. Wiens removed the brain from the cranial vault. *Id.* at 67 [505]. She testified that "sometimes people who have these vascular malformations, their initial presenting symptom is death because it bursts, it ruptures and they have acute bleeding. R.D. didn't have any of that." *Id.* She also testified that if Dr. Hua was correct that the VM bled before R.D. died, R.D's "initial symptom from a bleeding vascular malformation could be sudden unconsciousness and stop[ped] breathing," the same symptoms R.D. had, but a ruptured or bleeding VM in a different location of the brain may only cause "stroke symptoms." *Id.* at 67-68 [506-07], 102-04 [541-43]. Dr. Weins testified that the VM on R.D.'s brain stem would not have caused R.D.'s healing rib fractures, thoracic spinal cord hemorrhage, the contusions on the underside of her scalp and her occipital bone. *Id.* at 111-12 [550-51].

Dr. Baxter testified, generally, about AHT and testified, specifically, about R.D.'s case. Dr. Baxter explained that AHT includes "any injury to a child's head that was inflicted on them," ranging from a "something . . . minor like a facial injury or eye injury or ear injury" to "more significant head injuries" that include "bleeding about the brain, bleeding within different layers of the brain, or contusions." Dkt. 18-14 at 96-97 [626-27]. During his general testimony about AHT, Dr. Baxter used a demonstrative aid, a PowerPoint presentation depicting injuries that can occur to an infant's brain during an abusive shaking event. *Id.* at 98-106 [728-36]. Dr. Baxter testified that after an abusive shaking event, consequences to the brain could include damage to bridging veins, subdural bleeding, and damage to nerves that communicate with the diaphragm, impairing an infant's breathing and heart rate. *Id.* at 101-10 [731-40]. He testified that an abusive shaking event does not always cause neck injury or external injuries. Dkt. 18-15 at 9-10 [759-60]. Dr. Baxter testified that "shaking alone can cause fairly significant injury" and that any "impact

amplifies that injury because it causes the head to abruptly stop but the contents of the head
continue to move" so doctors "see oftentimes a shaking mechanism with impact causing more
severe injury at times." *Id.* at 11 [761]. He also testified that children with AHT who "have
catastrophic injuries" would "present immediately with symptoms," and would not "act normal"
after a shaking event, whereas those who have less significant injuries may suffer a mild seizure
but recover or may vomit and suffer progressively worsening symptoms. *Id.* at 12-14 [762-64].

Dr. Baxter's involvement in R.D.'s case began when Dr. Jaiswal consulted him about
R.D.'s head injury. *Id.* at 14 [764]. After speaking with R.D.'s treatment team and reviewing her
medical records (including birth records) and test results, Dr. Baxter spoke with Jenna and
Dickerson, separately, and obtained a history from each parent regarding the days leading up to
R.D.'s hospitalization. *Id.* at 14-28 [764-78]. Jenna and Dickerson told Dr. Baxter they were
unaware of any accidental falls or other events that could have caused R.D.'s injuries. *Id.* Dr.
Baxter learned from R.D.'s parents that R.D. had been fussy after beginning a new kind of formula.
*Id.* He testified that, in general, infants are at higher risk for abuse during the "period of purple
crying" a period he described as peaking between roughly six weeks and two months, when infants
are "gassy, fussy or colicky." *Id.* at 28-29 [778-79]. He also testified that infants are at higher risk
for abuse when parents are tired or frustrated. *Id.* Dr. Baxter admitted on cross-examination that
most tired and frustrated parents, even those who argue with each other, do not abuse or murder
their infants. *Id.* at 84 [834].

Dr. Baxter examined R.D. while she was in the hospital and found no external signs of
trauma aside from a slight, insignificant bruise on the bridge of her nose and some injuries
consistent with medical intervention. *Id.* at 84-88 [834-38]. He testified that R.D.'s CT scan
showed bilateral subdural bleeding, "some subarachnoid blood," and "a lot of brain swelling." *Id.*

10

at 35-36 [785-86]. Dr. Baxter testified that R.D. had an eye examination about thirty to thirty-six hours after being admitted to the hospital, and the ophthalmologist, Dr. Steven Groves, "saw scatter retinal hemorrhages which is basically small areas of bleeding on the retina." *Id.* at 37 [787], 78-79 [828-29]. Dr. Baxter acknowledged that Dr. Groves noted in his initial report that he did not believe those were indicative of a head injury,[7] and that Dr. Weins found no retinal hemorrhages on autopsy. *Id.* at 79 [829]. Dr. Baxter concurred with Dr. Wiens's finding of an optic nerve sheath hemorrhage in R.D.'s left eye, but he described it as a nonspecific injury that, standing alone, was not indicative of AHT. *Id.* at 37 [787], 77-78 [827-28]. Dr. Baxter agreed with Dr. Weins that there was no skull fracture, and he testified that R.D. had no neck injury. *Id.* at 90 [840]. Dr. Baxter concurred with Dr. Weins's conclusion that the contusions found in the inside of R.D.'s scalp and on her occipital bone likely were blunt impact injuries. *Id.* at 44-45 [794-95]. He also testified that doctors do not always see external bruising even with internal head or body injury because the force of the impact may be transmitted internally. *Id.* 88-89 [838-39]. Dr. Baxter also concurred with Dr. Weins that R.D.'s rib fractures were healing and likely were inflicted between one and three weeks before her death. *Id.* at 38-40 [788-90]. Based on the timing and location of the rib fractures and his review of R.D.'s birth records, Dr. Baxter testified these fractures likely were not birth injuries. *Id.* at 40-41 [790-91]. Referring to statements Dickerson made to detectives that R.D. appeared to have discomfort on her side roughly two weeks before

---

[7] Dr. Baxter testified that Dr. Groves later issued an amended opinion, agreeing with Dr. Baxter that R.D. suffered from AHT, after the two doctors had a conversation about R.D.'s other injuries and "social history." *Id.* at 100-03 [850-53].

her death,[8] Dr. Baxter testified those statements would be consistent with the finding that R.D. had healing rib fractures. *Id.* at 42 [792]. Dr. Baxter opined that R.D.'s healing thoracic spine hemorrhage likely occurred during the event that caused the rib fractures and could have been caused by the "mechanism of an acceleration-deceleration of the spinal cord being moved back and forth," or if R.D. had been "slammed down on her bottom causing some of the spinal cord to move relative to the rest of the tissue." *Id.* at 43-44 [793-94]. Dr. Baxter testified that R.D.'s healing rib fractures and thoracic spine hemorrhage were significant to him because "past injuries" are predictive of "future . . . inflicted injuries." *Id.* Dr. Baxter opined that the "mechanism of injury" for R.D.'s contusions, subdural hematoma, subarachnoid hemorrhage, and optic nerve sheath hemorrhage "was acceleration-deceleration injury with impacts on two different sides of her head"; that R.D. would have "immediately" lost consciousness after the event that caused these injuries; and that R.D.'s healing rib fractures and spinal cord hemorrhage made it likely that R.D. suffered more than one abusive event. *Id.* at 45-47 [795-97], 96-98 [846-48].

Anticipating Dr. Hua's testimony, Dr. Baxter testified that a finding that R.D. had a VM in her brain stem does not preclude a finding that she was abused. *Id.* at 54-55 [804-05]. He disagreed with Dr. Hua's opinion that R.D.'s subdural hematoma and subarachnoid hemorrhaging were caused by the VM, described the VM as "not significant," and testified that "the site of the bleeding was elsewhere" and "the type of overall diffuse injury she had through her brain" was "not

---

[8] During his April 2016 interview, detectives asked Dickerson about the finding that R.D. had healing rib fractures. Dkt. 19, State's Ex. 47 at 15:40 to 18:30. Dickerson stated that he did not know about fractures that he had previously discussed them with Gutierrez, the DHS investigator. *Id.* He stated that R.D. appeared to have discomfort and cried after he bathed her when she was between two and four weeks old, that he discussed this with Jenna when Jenna returned home, that he and Jenna agreed to watch and see if R.D. had any further discomfort, and that R.D. did not seem to have any problems moving forward. *Id.* Jenna testified that had not heard anything about the rib fractures or about Dickerson's statements regarding R.D.'s discomfort during bathtime until she spoke with Gutierrez. Dkt. 18-11 at 144-49 [323-28].

consistent with" a bleeding or ruptured VM.  *Id.* at 55 [805].  Dr. Baxter testified that nothing in Dr. Hua's report caused Dr. Baxter to question his own medical findings or to change his diagnosis of "child physical abuse, specifically, abusive head trauma."  *Id.* at 59-60 [809-10].

### 2.    Evidence of sibling abuse and domestic violence

Jenna testified, on direct examination, about two prior incidents involving Dickerson's alleged abuse of R.D.'s siblings.  First, Jenna testified that when T.D. was between one and two years old, T.D. had a tantrum at a shopping mall, and Dickerson "picked her up and spanked her" "on the side of her leg."  Dkt. 18-11 at 161-62 [340-41], 196-97 [375-76].  According to Jenna, Dickerson then took T.D. to a fitting room, out of Jenna's view and, when they returned home, she saw a "red mark" or "handprint" on the bottom of T.D.'s jawline.  *Id.* at 162-64 [341-43].  Jenna testified that when she confronted Dickerson, he denied hitting T.D. in the face.  *Id.* at 164-66 [343-45].  Second, Jenna testified that K.D. suffered "a bruise . . . on the top of his cheekbone," and Dickerson called Jenna at work to tell her that T.D. had "accidentally kicked [K.D.] in the face."  *Id.* at 166-68 [345-47].[9]  Jenna testified on cross-examination that both before and after R.D.'s death she had no concerns about the children's safety with Dickerson.  *Id.* at 184 [363], 198-99 [377-78].  On redirect examination, Jenna testified Dickerson physically assaulted her or threatened to physically assault her in the presence of R.D.'s siblings less than five times and that the last time was before she was pregnant with R.D.  Dkt. 18-13 at 13-15 [452-54].

---

[9] Jenna gave unclear testimony about K.D.'s age when he suffered the facial bruise.  On direct examination, Jenna testified he was "maybe two" and "could walk" and when the prosecutor asked if K.D. could have been two months old, Jenna replied, "No," and "There was no way he was two months old, he was walking."  Dkt. 18-11 at 166-68 [345-47].  On cross-examination, Jenna testified that she had no reason to question Dickerson's explanation that T.D. had kicked K.D. in the face because T.D. "was maybe two or three, so - - jumping on the bed, she gets rough."  *Id.* at 198 [377].  Jenna also testified that T.D. was two years older than K.D., and that K.D. was two years old when R.D. died.  Dkt. 18-11 at 101-02.

Dr. Baxter testified it was important for him, as a pediatrician, to know whether a child's siblings have a history of injuries because "any violence in the home is a predictor of abuse in children." Dkt. 18-15 at 47 [797]. Dr. Baxter testified he learned that K.D. sustained a facial bruise when K.D. was two months old, that this was significant because K.D. then would have been nearly the same age as R.D. when R.D. was injured, and that "[i]t shows a pattern of injury to children at the same age when they become colicky, fussy-type period." *Id.* at 48 [798]. He also testified that if Dickerson caused a handprint on T.D.'s face when she threw a tantrum, that would be concerning because "[a] common thing we see in our field is injuries when children are slapped or hit in the face is a handprint" and that is "excessive force and not appropriate discipline." *Id.* at 51 [801]. Dr. Baxter also testified it was concerning to him that R.D. and her siblings all sustained injuries to their heads and faces while in Dickerson's care. *Id.* at 52 [802].

### B.    Defendant's case-in-chief

Dr. Hua reviewed R.D.'s medical records, including birth records and pediatric records, the autopsy report, the toxicology report, and photographs and microscopic slides from the autopsy. Dkt. 18-15 at 124-26 [874-76], 130-31 [880-81]. Dr. Hua agreed with several findings made by Dr. Baxter and Dr. Wiens, including the findings that R.D. had no neck injury, no retinal hemorrhages, no skull fractures, no external injuries, healing rib fractures, subdural and subarachnoid hemorrhages, brain swelling, a nonspecific optic nerve sheath hemorrhage in the left eye, and two "fresh" contusions on the underside of her scalp and her occipital bone. *Id.* at 132-36 [882-86], 143 [893], 162 [912], 171-78 [921-28]; Dkt. 18-16 at 1-3 [929-31].

Dr. Hua disagreed, however, with Dr. Wiens's conclusions on cause and manner of death and Dr. Baxter's diagnosis of AHT. Dr. Hua testified that the contusions should have been externally visible to R.D.'s medical providers or detected by a CT scan before R.D.'s death if they

14

were blunt impact injuries inflicted before she was hospitalized.  Dkt. 18-15 at 136-46 [886-96]; Dkt. 18-16 at 4-5 [932-33], 32-33 [960-61].  Dr. Hua also suggested that the contusions could have been caused by placement of EEG pads, pads that were applied to the outside of R.D.'s scalp to measure brain activity, but he admitted there was no support in medical literature for that theory.  Dkt. 18-16 at 29-32 [957-60].  Dr. Hua testified that the injuries usually associated with AHT are brain dysfunction, subdural hematoma, and retinal hemorrhage.  Dkt. 18-15 at 178 [928].  Dr. Hua testified that if there had been retinal hemorrhages when R.D. was admitted to the hospital, they would have been evident on microscopic examination at autopsy.  *Id.* at 176-77 [926-27].  He acknowledged that AHT can occur without evidence of skull fractures and neck injury, but testified the absence of those injuries and the absence of retinal hemorrhages make AHT a less likely cause of R.D.'s death.  Dkt. 18-15 at 134 [884], 171-78 [121-28]; Dkt. 18-16 at 1-5 [929-33].  He also testified that a subarachnoid hemorrhage could be caused by trauma or by a ruptured VM.  Dkt. 18-15 at 174-75 [924-925].  Dr. Hua agreed that R.D. had healing rib fractures that were at least three weeks old but opined they could have been older.  Dkt. 18-16 at 2 [930].  Dr. Hua testified that, statistically, rib fractures make child abuse more likely, but in R.D.'s case there is actual evidence of that she had a "fatal lesion," the VM, and evidence of bleeding associated with the VM.  *Id.* at 2-4 [930-32].

Dr. Hua's remaining testimony focused on his review of three microscopic slides from R.D.'s autopsy—Slides 12, 16, and 17—and how those slides support his conclusion that R.D. died from a congenital and "fatal - - potentially fatal, at least" VM.  Dkt. 18-15 at 146 [896], 157-58 [907-08], 163 [913]; Dkt. 18-16 at 5-6 [933-34].  Dr. Hua testified that Slide 12 contains a thin slice of R.D.'s brain stem and that the VM is "obviously observable" on Slide 12.  Dkt. 18-15 at

146-49 [896-99], 160 [910].[10]   He described the VM as a "large cluster vessel," a "thick wall vessel" and a "poorly formed vessel," and testified that all VMs carry "a risk of spontaneous rupture."  *Id.* at 148-51 [898-901], 156-57 [906-07].   When McArtor asked whether there is evidence from Slide 12 that R.D.'s VM ruptured, Dr. Hua testified "misleadingly no." *Id.* at 151-52 [901-02].  Dr. Hua explained that the tissue on Slide 12 depicts only a two-dimensional structure and does not show whether the three-dimensional structure of the VM ruptured.  *Id.* at 152-53 [902-03].  Dr. Hua testified that a VM can leak blood and cause symptoms before it ruptures, but each patient may present with different symptoms.  *Id.* at 153-54 [903-04].  Dr. Hua testified that a leaking VM could present as a subdural hematoma and a subarachnoid hemorrhage.  *Id.* at 156-57 [906-07].  He explained that a complete rupture could cause sudden death, depending on the location of the VM, and that a VM in the brain stem, like R.D.'s, is more concerning because the brain stem controls vital functions.  *Id.* at 154 [904].  He also testified that a leaking VM would leave "footprints," specifically, hemosiderin pigment—a "distinct orange-colored pigment" that is generated when microphages digest red blood cells from a bleeding event—and that both he and Dr. Weins observed hemosiderin pigment on a microscopic slide from R.D.'s autopsy.  *Id.* at 142-43 [892-93], 155 [905], 171-73 [921-23].

Dr. Hua testified that Slide 16 contained a sample of blood taken from R.D.'s subdural hematoma and that Dr. Wiens could not have accurately determined the age of the subdural hematoma from Slide 16 because the proper way to determine the age of a subdural hematoma is

---

[10] Dr. Hua noted that Dr. Weins did not mention the VM in her report, testified that "it's hard to imagine for a doctor to miss it," and compared looking at Slide 12 and missing the VM to looking at a U.S. map and missing Texas.  Dkt. 18-15 at 160-62 [910-12].  Later, he testified that "[a]ny reasonable, competent, good doctor should see [the VM] by naked eye."  Dkt. 18-16 at 55 [983].

to examine the interface between the dura and the blood. *Id.* at 167-173 [917-23]. Dr. Hua testified that microscopic examination of the dura-blood interface is needed because that is where the "organization" or healing process occurs. *Id.* He testified that Slide 17 contained a sample of the dura-blood interface and he agreed with Dr. Wiens's report that described Slide 17 as depicting "dense fibrous tissue with extensive bleeding, frequent multiple scattered hemosiderin laden microphage identified." *Id.* at 170-72 [920-22]. Dr. Hua testified that the presence of multiple scattered hemosiderin laden microphage suggests that the subdural hematoma was more than five days old and was consistent with a finding that the VM was leaking blood before R.D. was hospitalized. *Id.*

On cross-examination, Dr. Hua testified that the VM was "a couple of millimeters" and big enough to be seen on autopsy without microscopic examination; he equated the size of R.D.'s VM to the size of "a sesame seed" on a McDonald's bun. Dkt. 18-16 at 33-34 [961-62], 54 [982]. He testified that size is not significant because even a small VM can be fatal if it ruptures. *Id.* Dr. Hua testified there were several items he did not review in reaching his conclusions about R.D.'s cause of death, including police reports and Dickerson's interviews, and explained that he was asked to "testify from a medical perspective." *Id.* at 17-22 [945-50]. Dr. Hua testified that a baby could have a VM and be abused. *Id.* at 36 [964]. Dr. Hua also testified that abused children need protection, but that doctors and medical examiners should carefully consider and rule out natural causes of death before fixing the manner of death as homicide and should have considered R.D.'s cause of death as natural because she had a potentially fatal aneurysm. *Id.* at 58 [986].

### C.    Verdict and sentence

The jury deliberated for "about eight hours" before it returned a guilty verdict and recommended a sentence of life with the possibility of parole. Dkt. 18-18 at 22-22 [90-91]. The

trial court sentenced Dickerson accordingly.  Dkt. 18-19 at 7.

### III.    Direct appeal, state postconviction, and federal habeas proceedings

Represented by Maria Kolar, Dickerson directly appealed, raising five claims, and applied for an evidentiary hearing to further develop his claim that McArtor and Mims provided constitutionally deficient representation.  Dkts. 17-2, 17-3.  The Oklahoma Court of Criminal Appeals ("OCCA") remanded the case to the trial court for an evidentiary hearing.  Dkt. 17-5.  A two-day evidentiary hearing was held in May 2020, and the state district court heard testimony from three witnesses:  Mark Shuman, M.D., McArtor and Mims.  Dkts. 18-23, 18-24.  The focus of this evidentiary hearing was Dickerson's allegation that McArtor and Mims failed "to pursue and obtain tissue evidence of innocence" specifically, evidence that the VM in R.D.'s brain stem had, in fact, fatally ruptured, as Dr. Shuman opined.  Dkt. 18-23 at 21-23, 131-34, 253.  Following the hearing, the trial court submitted findings of fact and conclusions of law to the OCCA, and Dickerson and the State filed supplemental appellate briefs.  Dkts. 17-6, 17-7, 17-8.  The OCCA rejected each of Dickerson's claims and affirmed his judgment in November 2020.  Dkt. 17-1.

In February 2022, Dickerson simultaneously applied for state postconviction relief, raising three claims, and petitioned for a federal writ of habeas corpus.  Dkts. 2, 4-1.  On Dickerson's motion, the Court stayed this habeas proceeding pending the conclusion of state postconviction proceedings.  Dkt. 6.  The state district court held a postconviction evidentiary hearing in November 2022 and heard testimony from one witness:  Ronald Auer, M.D.  Dkt. 18-25.  The focus of this evidentiary hearing was Dickerson's allegation that McArtor, Mims, and Kolar, provided constitutionally deficient representation at trial and on direct appeal by failing to investigate potential non-neuro natural causes of death, specifically, whether R.D. died from interstitial pneumonia, as Dr. Auer opined.  *Id.* at 13; Dkt. 17-10 at 6.  The state district court

denied Dickerson's application for postconviction relief. Dkt. 18-47 at 22-28; Dkt. 18-48 at 1-7. Dickerson appealed and, in July 2023, the OCCA affirmed the denial of postconviction relief. Dkt. 17-10. Thereafter, the Court lifted the stay. Dkt. 9. This matter is fully briefed and ripe for adjudication.

## DISCUSSION

A federal court may grant habeas relief to a state prisoner if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). "A state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court." *Davis v Davila*, 582 U.S. 521, 527 (2017); *see* 28 U.S.C. § 2254(b)(1)(A). The scope of federal habeas review depends on how the state court resolved the federal claim that was presented to it.

If the state court denied the federal claim based on an independent and adequate state procedural rule, the federal claim is technically exhausted but procedurally defaulted for purposes of federal habeas review. *Davila*, 582 U.S. at 527; *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), *modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). A federal court may not review, much less grant habeas relief on, a procedurally defaulted claim unless the petitioner first shows either cause for the procedural default and resulting prejudice or that the federal court's failure to review the claim will result in a fundamental miscarriage of justice. *Davila*, 582 U.S. at 527; *Coleman*, 501 U.S. at 750. If the state court denied the federal claim after a merits adjudication, a federal court may grant habeas relief only if the petitioner first shows that the state court's adjudication of the federal claim resulted in a decision that either (1) is "contrary to . . .

19

clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," *id.*, or (3) is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Even when a petitioner overcomes a procedural default of a federal claim or satisfies § 2254(d)'s preconditions, the federal court will not automatically grant habeas relief. Rather, the federal court will review the federal claim de novo and, if the court finds a constitutional error, "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). Under the *Brecht* standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

## I.    <u>Claim one</u>:  admission of unduly prejudicial evidence

Dickerson claims the trial court violated his Fourteenth Amendment right to due process by admitting unduly prejudicial evidence—specifically, evidence that he abused Jenna, on several occasions, and abused R.D.'s older siblings, on two occasions, before R.D.'s death. Dkt. 2, at 6; Dkt. 10, at 26-41.

### A.    Clearly established federal law

The admission of evidence at a state criminal trial is largely a matter of state law. Even if evidence is admitted in violation of state law, that state-law error ordinarily "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lisenba v. California*, 314 U.S. 219, 228 (1941) (noting that federal habeas courts "do not sit to review state court action on questions of the propriety of the trial judge's action in the admission

20

of evidence"); *Thornburg v. Mullin*, 422 F.3d 1113, 1124 (10th Cir. 2005) (noting that a federal habeas court's "concern is not whether state rules of evidence were violated" and the court "must confine [itself] to 'deciding whether a conviction violated the Constitution, laws, or treaties of the United States'" (quoting *McGuire*, 502 U.S. at 68)). Habeas review of state evidentiary rulings is limited to determining whether the admission of the challenged evidence "so infused the trial with unfairness as to deny due process of law." *Lisenba*, 314 U.S. at 228; *see also Andrew v. White*, 604 U.S. ___, 145 S. Ct. 75, 83 (2025) (explaining that "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair"); *id.* at 83 (Alito, J., concurring in judgment) (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), and *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994), as "establish[ing] that a defendant's due-process rights can be violated when the properly admitted evidence at trial is overwhelmed by a flood of irrelevant and highly prejudicial evidence that renders the trial fundamentally unfair"). In making that determination, a federal court must consider the admission of the challenged evidence within the context of the entire proceeding and may "consider the relevance of the disputed evidence to the charges or sentencing factors, the degree of prejudice [the petitioner] suffered from its introduction, and whether the trial court provided any mitigating instructions." *Andrew*, 145 S. Ct. at 83.

But when the state court has already adjudicated a federal claim alleging the admission of unduly prejudicial evidence deprived the petitioner of due process, the petitioner faces the initial hurdle of satisfying § 2254(d) by showing that the state court had no reasonable basis to reject the federal due process claim. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). And because the federal due process standard provides a general rule of application, state courts have more leeway in applying that rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see also Duckett v. Mullin*,

306 F.3d 982, 999 (10th Cir. 2002) ("[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements," when engaged in such an endeavor a federal court must "tread gingerly" and exercise "considerable self-restraint." (alteration in original) (quoting *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990))).

### B.    Additional facts

Before trial, the State filed written notice of its intent to introduce extensive evidence of other crimes, wrongs, or acts allegedly committed by Dickerson.  Dkt. 18-29 at 14-31; *see* Okla. Stat. tit. 12, § 2404(B) (providing that "[e]vidence of other crimes, wrongs, or acts" may not be admitted as character evidence but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident"). Among other things, the State sought to admit evidence that Dickerson verbally and physically abused Jenna on several occasions over several years, and physically abused R.D.'s older siblings, T.D. and K.D., on two specific occasions.  *Id.* at 16-20, 23-24; Dkt. 18-31 at 43-46; Dkt. 18-34 at 28-40; Dkt. 18-35 at 25-29.   The State initially argued that this evidence was admissible for every purpose listed in the statute but later sought its admission to show "absence of mistake or accident" and "identity."  Dkt. 18-29 at 27-28.   Dickerson moved before trial to exclude domestic abuse evidence, arguing that evidence was unsubstantiated, irrelevant, had no "visible connection" to the crime charged, and would be more prejudicial than probative.  *Id.* at 36-44, 48-50; Dkt. 18-30 at 5-10; Dkt. 18-31 at 4-7.  Dickerson also argued that the State mischaracterized his defense as one asserting mistake or accident, when his defense was that R.D. died of natural causes.  Dkt. 18-35 at 3-9.

After a hearing, the trial court entered a written pretrial order stating, in part, that "[n]o evidence will be permitted in the State's case-in-chief regarding the past alleged domestic abuse

of the victim's mother," and reasoning that the State did not show "a visible connection between the child abuse murder charge and the past domestic abuse between [Dickerson] and [Jenna]." Dkt. 18-35 at 10-12. The trial court further reasoned that even if the State could show a visible connection, "the probative value would be substantially outweighed by the danger of unfair prejudice and/or confusion of the issues." *Id.* In that same order, the trial court took under advisement the State's request to admit sibling abuse evidence. *Id.* at 13. In a separate pretrial ruling, and after hearing additional oral arguments, the trial court agreed with the State's suggestion that Dickerson's defense could be characterized as either lack of mistake or accident and concluded that the State could present evidence of two instances of prior alleged abuse of T.D. and K.D. Dkt. 18-8 at 7-16.

At trial, Jenna testified that when T.D. was between one and two years old T.D. had a tantrum at a shopping mall, and Dickerson "picked her up and spanked her" "on the side of her leg." Dkt. 18-11 at 161-62 [340-41], 196-97 [375-76]. Jenna further testified that Dickerson took T.D. to a fitting room, out of Jenna's view, and that when they returned home, she saw a "red mark" or "handprint" on the bottom of T.D.'s jawline. *Id.* at 162-64 [341-43]. Jenna testified that when she confronted Dickerson, "he said he didn't hit [T.D.] in the face." *Id.* at 164-66 [343-45]. Jenna testified that K.D. suffered "a bruise . . . on the top of his cheekbone," and Dickerson called Jenna at work to tell her that T.D. had "accidentally kicked [K.D.] in the face." *Id.* at 166-68 [345-47]. Though Jenna's testimony was unclear on K.D.'s age at the time of this incident, Dr. Baxter testified that K.D. was two months old when he sustained the facial bruise, that it was significant to him that K.D. and R.D. sustained injuries at roughly the same age while in Dickerson's care, and that this "shows a pattern of injury to children at the same age when they become colicky" and "fussy." Dkt. 18-15 at 48-52 [798-802].

23

On cross-examination, Jenna testified that she was not concerned about leaving R.D. with Dickerson when she and R.D.'s siblings went to Catoosa to stay with Sydney. *Id.* at 184 [363]. After testifying again about the two instances of alleged abuse involving T.D. and K.D., Jenna testified that she had no concerns about her children's safety while they were in Dickerson's care. *Id.* at 198-99 [377-78]. Jenna also testified that even after R.D. died and she and R.D.'s siblings moved back to Texas, she had no concerns that Dickerson posed a danger to R.D.'s siblings when Dickerson would visit them on the weekends. *Id.* at 199 [378].

At the conclusion of Jenna's cross-examination, the State argued, at a bench conference, that McArtor had "opened at least some leeway" for the State to ask Jenna about prior domestic abuse. *Id.* at 200-06 [379-85]. After hearing arguments from both parties, and considering the matter overnight, the trial court ruled that the State could ask questions narrowly tailored to four issues: (1) whether Dickerson physically assaulted or threatened Jenna in front of the children, (2) if so, how many times has that happened, (3) if so, when has that happened, and (4) if there have been any such occasions, does that change Jenna's testimony regarding whether she has concerns about the safety of her children in Dickerson's care. *Id.*; Dkt. 18-12 at 41-50 [429-38]; Dkt. 18-13 at 5-10 [444-49].

On redirect examination, Jenna testified that Dickerson had physically assaulted her the presence of her children. *Id.* at 11-12 [450-51]. McAmis then asked, "Can you tell us how many times this defendant has physically assaulted you?", and Jenna replied, "No." *Id.* McAmis then asked why Jenna could not give "that number," and Jenna replied, "We've been together for six years." *Id.* McArtor objected, and the trial court called a bench conference to remind McAmis that she was to frame the permitted questions "within the presence of the children." *Id.* On further questioning, Jenna testified Dickerson physically assaulted her or threatened to physically assault

24

her in the presence of the children less than five times and that the last time was before she was

pregnant with R.D. *Id.* at 13 [452].[11]   The trial court twice instructed the jury, immediately after

Jenna's testimony and at the close of all evidence, that it could consider Jenna's testimony about

domestic abuse only as impeachment evidence and to determine her credibility and not as

substantive evidence of innocence or guilt. *Id.* at 22-23 [461-62]; Dkt. 18-36 at 34.   The trial court

also instructed the jury, at the close of all evidence, that it could consider evidence of alleged

"misconduct other than that charged in the information" only for the limited purposes of "absence

of mistake or accident," and not as "proof of [Dickerson's] guilt or innocence" as to the crime

charged.   Dkt. 18-36 at 33.

### C.      OCCA decision

On direct appeal, Dickerson's asserted in his issue statement that the trial court abused its

discretion by admitting "irrelevant and unfairly prejudicial 'bad acts' character evidence," namely,

the domestic and sibling abuse evidence, "in violation of Dickerson's right to due process and a

fair trial."  Dkt. 17-2 at 27.   Dickerson's supporting argument was grounded in state law.   Dkt. 17-

2 at 32-36.   The OCCA noted that Dickerson did not object at trial to the admission of sibling

abuse evidence.   Dkt. 17-1 at 3.   Applying state law and plain-error review, the OCCA found no

plain error, reasoning that the trial court properly admitted "this evidence under the exception for

absence of mistake or accident, as tending to show the victim's death was the result of criminal

injury by [Dickerson]." *Id.* at 3-5.   The OCCA noted that Dickerson timely objected to the

admission of domestic abuse evidence and found no abuse of discretion, reasoning that the "trial

---

[11] McAmis tried to further impeach Jenna by suggesting that she had previously made statements during the investigation of R.D.'s death that there had been an incident of physical violence after R.D.'s birth, but Jenna denied making any such statements, and the trial court told McAmis to "move on."  Dkt. 18-13 at 14-15 [453-54].

court admitted this evidence not under an exception for other bad acts, but to impeach [Jenna] for

bias and truthfulness after she testified she had no concerns for the safety of her other children,

and had allowed them to spend time with [Dickerson] even after the death of their youngest child."

*Id.* at 5.  The OCCA further reasoned:

> The State sought to impeach [Jenna's] testimony, seemingly favorable to
> [Dickerson], with [Dickerson's] prior acts of violence toward [Jenna].  [Jenna]
> acknowledged that he had threatened and assaulted her in the presence of their older
> children perhaps five times, all pre-dating the birth of the victim.  Specific details
> were not introduced, and the court instructed the jury that the testimony "regarding
> the defendant's physical assaults and/or threats against her was offered to show that
> [Jenna's] testimony is not believable or truthful."
>
> We find that the admission of this evidence for a limited purpose defined
> by proper instructions, to discredit [Jenna's] favorable testimony for the accused,
> was a proper and fair use of this evidence.  The trial court did not abuse its discretion
> or commit plain or obvious error in allowing evidence of [Dickerson's] other
> crimes, wrongs, or bad acts.

*Id.* at 5-6.

### D.    Analysis and conclusion

Dickerson makes two arguments in support of claim one.  Neither supports a grant of

federal habeas relief.  First, Dickerson contends that the trial court failed to correctly apply state

evidentiary rules when it determined that the challenged evidence was admissible, thereby

depriving Dickerson of his Fourteenth Amendment right to a fair trial.  Dkt. 10 at 35-39.  As

Respondent argues whether the trial court complied with state law is a question of state law that is

not cognizable on federal habeas review.  Dkt. 17 at 48-50; *see McGuire*, 502 U.S. at 67-68;

*Leatherwood v. Allbaugh*, 861 F.3d 1034, 1043 (10th Cir. 2017) (noting that a habeas petitioner

"cannot transform a state law claim into a federal one merely by attaching a due process label").

Second, Dickerson contends that the OCCA's rejection of his Fourteenth Amendment due

process claim challenging the admission of unduly prejudicial domestic and sibling abuse evidence

is contrary to, or based on an unreasonable application of, clearly established federal law, or is

based on an unreasonable determination of the facts presented in state court, because the State clearly sought admission this evidence to show that Dickerson had a propensity for violence. *Id.* at 40-41. Respondent contends Dickerson has not identified any clearly established federal law to support a Fourteenth Amendment due process claim challenging the admission of other crimes or bad acts evidence and that even if he asserts a cognizable federal due process claim, Dickerson procedurally defaulted that claim by not fairly presenting a federal due process claim to the OCCA. Dkt. 17 at 42-47, 52-55. Dickerson contends he fairly presented a cognizable federal due process claim to the OCCA by identifying the relevant facts, referring to "due process" and a "fair trial" in his issue statement, and citing a prior OCCA decision that addressed a similar state law evidentiary claim and that stated, at the end of that decision, that "due process under the United States and Oklahoma constitutions demands that appellant be convicted for the crimes for which he is charged and not for being a bad character." Dkt. 22 at 5-7 (citing *Wells v. State*, 799 P.2d 1128, 1130-31 (Okla. Crim. App. 1990).

The Court finds that Dickerson identifies a cognizable federal due process claim. As Dickerson contends, the admission of unduly prejudicial evidence may, in some circumstances, rise to the level of a Fourteenth Amendment due process violation. Dkt. 10 at 40; *see Andrew*, 145 S. Ct. at 83; *Romano*, 512 U.S. at 12-13. But the Court further finds that Dickerson procedurally defaulted the federal due process claim because presenting a similar state law claim in state court does not satisfy the fair presentation requirement. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) (explaining that to fairly present a federal claim in state court "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made" (internal citation omitted)). Rather, a petitioner must show that he presented the facts and law necessary to support his federal claim "in a manner sufficient to put

the courts on notice of the federal constitutional claim." *Grant v. Royal*, 886 F.3d 874, 890 (10th Cir. 2018) (quoting *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012)). Dickerson's reference to due process and fair trial in the issue statement of his state appellate brief, followed by arguments grounded entirely in state law, was not sufficient to fairly present a federal due process claim. *Cf. Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement."). And the OCCA's decision reflects that it understood and adjudicated Dickerson's challenge to the admission of evidence as a state law claim. Dkt. 17-1 at 2-6. *See Johnson v. Williams*, 568 U.S. 289, 299 (2013) (noting that "a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim"). On this record, the Court finds that Dickerson did not fairly present to the OCCA the federal due process claim that he asserts in claim one. The Court further finds that the federal due process claim is technically exhausted but procedurally defaulted because the OCCA likely would impose a procedural bar if Dickerson were to return to state court to exhaust this claim. *See Grant*, 886 F.3d at 891-82 (discussing anticipatory procedural bar and procedural default of habeas claims); *Hale v. Gibson*, 227 F.3d 1298, 1328 (10th Cir. 2000) ("Oklahoma bars collateral review of claims actually raised on direct appeal or those that could have been raised on direct appeal but were not."); Okla. Stat. tit 22, § 1086 (barring claims not raised on direct appeal unless the court "finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application"). In response to Respondent's procedural default

argument, Dickerson does not argue, and thus has not shown, that he can overcome the procedural default.  Dkt. 22 at 5-7.  His failure to make that showing is reason enough to deny relief as to claim one.

Because claim one, in part, asserts a non-cognizable state law claim and, in part, asserts a procedurally defaulted federal due process claim, the Court denies the Petition as to claim one.

## II.   <u>Claim two</u>:  *Brady* **violation based on "suppression" of demonstrative exhibit**

Dickerson claims the State violated his Fourteenth Amendment right to due process, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), "by not disclosing the full contents of a demonstrative exhibit."  Dkt. 2, at 8; Dkt. 10, at 41-49.

### A.   **Clearly established federal law**

*Brady* "requires the State to disclose material exculpatory and impeachment evidence regardless of whether a motion compelling such disclosure is filed or granted" and obligates the government "to disclose favorable evidence when it reaches the point of materiality, regardless of the defense's subjective or objective knowledge of such evidence."  *Fontenot v. Crow*, 4 F.4th 982, 1064, 1066 (10th Cir. 2021).  "To prevail on a *Brady* claim, the proponent must show that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'"  *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019) (quoting *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008)).  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

### B.   **Additional facts and OCCA decision**

Before trial, the State provided written notice that one or more witnesses providing medical testimony for the State would use a demonstrative aid during the State's case-in-chief to help

29

"explain human anatomy and what happens to a baby's brain and body when it is shaken." Dkt. 18-29 at 12-13. The notice stated that "the demonstrative aid must be accessed through the computer and it contains copyrighted material" so the State "cannot supply a copy of the aid to the defense" but "will make the aid available for viewing by defense counsel at a mutually convenient time between" the date of the notice and the beginning of trial. *Id.* Defense counsel objected to the use of the demonstrative aid, arguing its use would be more prejudicial than probative and "may cause undue delay since the Defendant and Counsel of the Defendant will not be supplied a copy of said aid." Dkt. 18-30 at 11-12. At trial, Dr. Baxter used the demonstrative aid, a PowerPoint presentation entitled "The Mechanism of Injury in the Shaken Baby Syndrome," and referred to images depicted in the presentation when he testified, in general terms, about injuries that can occur when infants suffer from abusive head trauma, including instances when an infant is held around the torso and shaken. Dkt. 18-14 at 98-115 [728-45]; *see also* Dkt. 18-15 at 9 [759] (prosecutor's question to Dr. Baxter describing demonstrative aid as "demonstrat[ing] the forces involved when a baby is abusively shaken").

On review of the appeal record, Dickerson's appellate counsel, Kolar, noticed that the demonstrative aid, designated at trial as "Court's Exhibit A," and other items were not included in the record and asked the OCCA to direct the state district court to supplement the record with the missing items. Dkt. 17-2 at 38. When Kolar viewed Court's Exhibit A, the CD-ROM containing the PowerPoint presentation, she found two video files of the same presentation, one with narration and one without, and a text file with the script of the narrated version. *Id.* Kolar also found no indication that the material contained on the CD-ROM is copyrighted. *Id.* Kolar asserted a *Brady* claim, arguing that the State suppressed exculpatory evidence by having Dr. Baxter use the un-narrated version of the presentation at trial. *Id.* More specifically, Kolar argued that portions of

30

the narrated version, describing certain "hallmarks" of "shaken baby syndrome," including retinal hemorrhages and axonal injuries described as "axon spheroids," could have been used to impeach Dr. Baxter's testimony because Dr. Weins and Dr. Hua testified that R.D. had no retinal hemorrhaging, and neither Dr. Baxter, Dr. Wiens, nor Dr. Hua, the latter two of whom microscopically reviewed R.D.'s brain tissue, testified about finding "axon spheroids" in R.D.'s brain. *Id.* at 38-39. Kolar argued that, had the prosecutor complied with *Brady* and provided a copy of the complete CD-ROM, McArtor and Mims could have argued the demonstrative aid was irrelevant, Dr. Baxter's testimony about shaken baby syndrome was irrelevant, and McAmis's closing arguments about shaken baby syndrome were improper and misleading. *Id.* at 39. Kolar further argued, "at a minimum, having the intended script of Dr. Baxter's favored animation would have been very helpful in cross-examining Dr. Baxter about all the 'hallmarks' of [shaken baby syndrome] that are missing in this case." *Id.*

The OCCA found no *Brady* violation. The OCCA stated:

> [Dickerson] argues that the *narrated* version of a presentation used by the State's expert witness, "The Mechanism of Injury in the Shaken Baby Syndrome," contains four exculpatory statements about typical child abuse injuries and should have been disclosed by the prosecutor. This narrated version was available for inspection by counsel at the time of trial and on appeal.

> This argument strains the meaning of "suppression" of evidence beyond sensible limits. The prosecutor's failure to utilize the supposedly more favorable, narrated version of the presentation, or call to defense counsel's specific attention favorable evidence in that un-used version of the exhibit, is simply not an act of concealment or "suppression" that gives rise to a potential due process violation.

Dkt. 17-1, at 6-7.

## C.    Analysis and conclusion

Respondent contends, and the Court finds, that § 2254(d) bars relief as to claim two. Dkt. 17 at 63-66. Even accepting Dickerson's argument that the statements from the narrated version of the demonstrative exhibit constitute exculpatory or impeachment evidence and that that

31

evidence is material, *see* Dkt. 10 at 48-49, Dickerson has not shown that the OCCA's decision is based on an unreasonable determination of the facts presented in state court, *see id.* at 44-47. The OCCA found, and the record supports, that the prosecutor notified defense counsel of the State's intent to use the PowerPoint presentation, advised defense counsel the presentation would need to be viewed on a computer, and further advised defense counsel that the presentation would be made available to defense counsel for viewing before trial. On these facts, it was objectively reasonable for the OCCA to conclude that the State did not "suppress" the demonstrative exhibit within the meaning of *Brady*.

Dickerson resists this conclusion, suggesting the State falsely stated in its written notice that the CD-ROM was copyrighted to avoid providing a copy of the CD-ROM to defense counsel and avoid alerting defense counsel "to the irrelevance of all the 'Shaken Baby Syndrome' evidence in this case." Dkt. 10 at 44-46. But *Brady* does not require the prosecution to disclose favorable evidence "in a specific form or manner." *Hooks v. Workman*, 689 F.3d 1148, 1180 (10th Cir. 2012) (quoting *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999)). And "[e]vidence is not suppressed within the meaning of *Brady* if it is made known and available to the defense prior to trial." *Id.* at 1179-80 (quoting *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004)). Regardless of the stated reason for not providing a copy of the CD-ROM, it was objectively reasonable for the OCCA to conclude that the State satisfied its obligation under *Brady* by making the demonstrative exhibit known and available for viewing before trial and that the State thus did not "suppress" the demonstrative exhibit. *Hooks*, 689 F.3d at 1180; *see also United States v. Pelullo*, 339 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable

information from materials that are so disclosed.").

Because § 2254(d) bars relief, the Court denies the Petition as to claim two.

### III.    Claim three:  prosecutorial misconduct

Next, Dickerson claims that multiple instances of prosecutorial misconduct deprived him of his Fourteenth Amendment right to due process.  Dkt. 2, at 9.  He contends, as he did on direct appeal, that the prosecutors: (1) violated a pretrial order regarding the admission of evidence of Dickerson's marijuana use; (2) conducted improper cross-examination of Dr. Hua regarding his fees; and (3) made improper closing arguments by emphasizing "improperly admitted other crimes evidence" and "'shaken baby syndrome' evidence."  Dkt. 10, at 49-60; Dkt. 17-2 at 40-50.

#### A.    Clearly established federal law

Prosecutorial misconduct violates the Fourteenth Amendment only if the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637,  643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  No constitutional error occurs if "the prosecutorial argument, in the context of the facts and circumstances of th[e] case, did not render [the] petitioner's trial unfair."  *Darden*, 477 U.S. at 183 n.15; *see Greer v. Miller*, 483 U.S. 756, 765 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985))).  In *Darden*, the Supreme Court found no due process violation even when the prosecutor's closing argument "deserve[d] the condemnation it ha[d] received from every court to review it."  477 U.S. at 179.

To determine whether prosecutorial misconduct rendered a trial fundamentally unfair, a reviewing court must examine the alleged misconduct in the context of the entire proceeding and

may consider the strength of the evidence against the petitioner and whether the effect of the misconduct was tempered by jury instructions or opposing arguments to evaluate "the likelihood that the jury's decision was influenced by [the misconduct]. *Id.* at 182; *see also Duckett v. Mullin*, 306 F.3d 982, 988-89 (10th Cir. 2002) ("[W]e look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. . . . Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." (quoting *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994))).   The focus of this "highly generalized standard for evaluating claims of prosecutorial misconduct" is fundamental fairness. *Parker v. Matthews*, 567 U.S. 37, 49 (2012).   Because the fundamental fairness principle identifies a general rule,  state courts have more leeway in applying that rule to the circumstances of each case. *Yarborough*, 541 U.S. at 664.

### B.    Additional facts and OCCA decision

### 1.    Marijuana evidence

Before trial, the State sought to admit evidence that Dickerson possessed and used marijuana and drug paraphernalia in his home and car.  Dkt. 18-29 at 25-29.  The State alleged Dickerson's use of marijuana was admissible res gestae evidence because officers responding to the 911 call smelled the odor of marijuana in the Dickersons' home, those officers found marijuana and drug paraphernalia in the home, and Dickerson admitted smoking marijuana before he took R.D. into the living room. *Id.*  The trial court issued a written pretrial order ruling, in part, that the State would be permitted to present evidence of Dickerson's use of marijuana "as it relates to the day of the alleged crime, as well as the Defendant's statement to police that he smoked marijuana the day of the alleged crime" but the State would not be permitted to present "[o]ther evidence of

[his] use/possession of marijuana/paraphernalia."   Dkt. 18-35 at 13.   At trial, one of the prosecutors, Jacoby, elicited testimony from Officer Kite that Kite smelled the odor of marijuana in the Dickerson's house when she responded to Jenna's 911 call.  Dkt. 18-13 at 187 [626].  Kite testified that Dickerson did not appear to be under the influence of narcotics or alcohol when she spoke with him.  *Id.* at 190-91 [629-30].  Kite further testified that, before Dickerson went to the hospital, Dickerson told her that he had marijuana in the house and that he had smoked marijuana the previous night.  Dkt. 18-14 at 2-3 [632-33].  The following colloquy then occurred between Jacoby and Officer Kite:

Q.    And after he told you that, what did he do?

A.    He told me that it was in the living room in kind of a cabinet stand in the corner.

Q.    And did he leave after that?

A.    Yes.

Q.    Okay.  And after he left you recall what you did next?

A.    I waited for the crime-scene detectives to arrive.

Q.    And once they arrived, what happened?

A.    I believe it was Detective Bax that I spoke with.  I just - - I told her everything that had transpired while I was there and showed her where the stand was where he had told me the marijuana was.

Q.    Did you observe any drugs or paraphernalia around where he said it would be?

A.    Yes.

Q.    What did you observe?

A.    There were several glass bongs or smoking pipes.

MR. McARTOR:    Objection, Judge.

THE COURT:    Overruled.

A.      Several smoking pipes.  I believe there was a set of electronic scales and a jar with some marijuana in it.

Q.      (By Ms. Jacoby)  Where was it located?  I apologize.

A.      In this cabinet stand.  I think it may have been like an aquarium stand - -

Q.      Okay.

A.      - - in the corner of the living room.

*Id.* at 3-4 [633-34].   On cross-examination, McArtor elicited testimony from Kite about Dickerson's admission that he smoked marijuana and had some in the house.  *Id.* at 5-6 [635-36].[12]

Later, during a recess, McArtor sought permission to make a record and argued that Jacoby violated the pretrial ruling by eliciting testimony that Dickerson had drug paraphernalia in the house.  *Id.* at 36-37 [666-67].  After giving Jacoby an opportunity to explain why she elicited testimony about paraphernalia,[13] the trial court concluded that Jacoby violated the clear language of the pretrial ruling and that the trial court should have sustained McArtor's objection.  *Id.* at 37-38 [667-68].  McArtor moved for a mistrial, and the trial court denied that request, reasoning that "although it was a violation of the order [and] the [c]ourt should have sustained the objection, the evidence was very fleeting."  *Id.*  McArtor did not request, and the trial court did not give, an instruction admonishing the jury to disregard Kite's testimony about finding drug paraphernalia and a set of electronic scales.  *Id.*

---

[12] The jury also heard Dickerson's statement, during his April 2016 interview, that he "smoked a blunt" before he took R.D. into the living room and fell asleep with R.D. in his arm. Dkt. 19, State's Ex. 47 at 12:15 to 13:20.

[13] Jacoby first stated, "I thought [Kite] was gonna testify to what [Dickerson] said." Dkt. 18-14 at 37.  The trial court noted that Jacoby "asked additional questions once it got started," and asked for further explanation.  *Id.*  Jacoby then said, "I don't believe any additional evidence she said stated that there was additional smoking other days."  *Id.*  The trial court was not moved: "Okay.  The statement says any use of paraphernalia, it doesn't say that you can use paraphernalia on that day.  It's pretty clear."  *Id.*

## 2.    Cross-examination of Dr. Hua

The lead prosecutor, McAmis, elicited testimony from Dr. Hua that his typical fees depend on what people can afford, and that his "standard fee" for a paying client is $450 an hour for review, $450 an hour for a report, and an additional flat fee of $4,500 for testifying, and that "typically there's a cap somewhere along the line." Dkt. 18-16 at 8-10 [936-38]. McAmis did not ask Dr. Hua if there was a cap on his fees in Dickerson's case.[14] *Id.* Dr. Hua estimated he spent around 20 hours reviewing R.D.'s case and two hours preparing his report. *Id.*

During her final closing argument, McAmis argued that this case was "so much about the medical evidence" and stated "we have so clear on one hand Dr. Wiems [sic] and Dr. Baxter, who tell you in no uncertain terms that R.D. was abused, R.D. was murdered. And on the other hand, we have Dr. Hua. So how do you decide; right?" Dkt. 18-17 at 62-63. She then argued that Dr. Wiens was "[j]ust doing her job" and "completely unbiased"; that Dr. Baxter's "sole duty and responsibility [was] to take care of his patient, R.D."; and that Dr. Hua was "biased and prejudiced" by "the almighty dollar." *Id.* at 63. McAmis reminded the jurors that Dr. Hua "is paid $450 an hour" and that is "[m]ore money than most of us will make in an hour of our lives." *Id.* McAmis then calculated Dr. Hua's total earnings at $14,400, an amount that should "offend[]" and "shock" the jury and cause the jury to doubt his credibility. *Id.* at 64. As she performed this calculation McAmis also suggested that Dr. Hua would be motivated to drive up his fees after receiving his "initial consultation" fee:

> After that, if he were to say, I can't help you, this is abuse, no more money. It's only when and if he says, I can come up with a myriad of reasons to try to explain this away, then the financial windfall to him is enormous, because at that point in

---

[14] Dickerson states, and the record shows, that the trial court approved an hourly fee rate of $350 for Dr. Hua's services and capped Dr. Hua's total fees at $8,500. Dkt. 18-31 at 28; Dkt. 10 at 54. He argues that McAmis likely was aware of this cap because the order approving Dr. Hua's fees was filed as a matter of record. *Id.*

time, when he says, oh, I'll come up with all these different explanations, then he gets another $450.00 an hour for all the consultation that's involved. What did he say in this case? Twenty hours. You know what 20 times $450 an hour is? $9,000.

But it's more than that, because if he is to say, yes, I'll take your case and I'll come up with all these explanations, then he's got to write the report, too; right? So he writes the report for $450.00 an hour, and he said that it took him two hours to write the report, so 450 times two, that's another $900.00. But that's not it. Because then he says, if I take your case and we do the consultation and I write the report, then I'll come to court and testify for you. How much does he get for that? $4,500.00 to come to court and testify. How many of us would love to have $4,500.00 right here at any time, but right here before Christmas.

*Id.* at 63-64. She later continued her theme that Dr. Hua's sole interest in the case was money:

But if that's not enough, then you actually have to look at what he came in here and tried to tell you. Did I get a little bit frustrated with him? Did I get a little angry with him? You bet I did. And I'm sorry. But this isn't a game. This isn't about money. This is about a baby girl who is dead, and whether or not she receives justice. And so don't come in here and try to sell us a bill of goods.

*Id.* at 65. McArtor and Mims did not object when McAmis elicited testimony from Dr. Hua about his fees,[15] did not elicit testimony from Dr. Hua on redirect examination to clarify that his fees in R.D.'s case had been capped by the trial court, and did not object to McAmis's closing remarks about Dr. Hua's fees or her remarks suggesting that he was creating baseless theories to earn more fees.

### 3. Sibling and domestic abuse evidence

During her initial closing argument, McAmis referred to the limiting instruction regarding

---

[15] McArtor did object when McAmis asked: "Do you know approximately how much money then you - - how much income you have taken in during the course of reviewing and testifying 20 to 30 times on behalf of people charged with hurting or killing a child?" Dkt. 18-16 at 10-11 [938-39]. The trial court called a bench conference and told McAmis to limit her questions to "how much he's been paid in this case." *Id.* Later, on cross-examination, McAmis asked Dr. Hua if he could have asked Dickerson's attorney to send additional reports that Dr. Hua testified he did not review so that he would be better prepared to "testify in a child abuse murder trial." Dkt. 18-16 at 44-45 [972-73]. When Dr. Hua agreed he could have requested more reports, McAmis stated, "Sure. I mean, you could have charged by the hour for that, right?" *Id.* at 45 [973]. McArtor objected, and the trial court overruled the objection. *Id.*

evidence that Dickerson previously abused R.D.'s older siblings:

> There's also an instruction that talks specifically about the prior incidents that
> you've heard about the Defendant being involved in with respect to T.D. and with
> respect to K.D.  Nobody is saying, and has never said, that because T.D. was injured
> in the Defendant's care, that because K.D. was injured in the Defendant's care, that
> means he murdered R.D.  But what you can consider it for, and what the law says
> you should consider it for, is that you have received evidence that the Defendant
> has allegedly committed misconduct other than that charged in the information.
> And this evidence can be considered by you on the issue of the Defendant's alleged
> absence of mistake or accident.

> So you can and you should consider the fact that is it just a horrible coincidence
> that when the Defendant is with T.D. she ends up with a handprint mark to the face,
> when the Defendant is with K.D. he ends up with a bruise to the face, and when the
> [D]efendant is with R.D. she ends up dead from head injuries.  Either, darn the luck,
> this Defendant is the most unlucky person in all the world, or he can't take it when
> kids cry and fuss, and he goes way too far with his physical abilities.

Dkt. 18-17 at 17-18.

> During her final closing argument, McAmis turned to domestic abuse evidence, stating:

> So what about Jenna?  I mean it's hard not to feel sorry for Jenna.  She lost
> a baby.  But I would submit it's equally hard not to be so, so frustrated with her.
> It's interesting, because Defense Counsel want you to believe the good things that
> she said about his client, the fact that she still doesn't believe he's a danger to her
> children.  . . .

> In some ways, you can understand Jenna, and that she has been with this
> man since she was 15 years old, and she has had three children by him.  But for her
> to say he is not a danger to her children when I then asked her how many times has
> he physically assaulted you, Jenna, or physical[ly] threatened you, Jenna, in front
> of your children.  The answer to that question should be absolutely none.  Or maybe
> the answer to that question might be, well, once, but we worked through it.  But for
> Jenna to say that she doesn't even know the number of times that it has happened
> because they've been together for six years, it's not only so sad, but it is also so
> telling.  So bless her heart.  How could she possibly stay with this man?

> Maybe if Jenna had been strong enough, or able enough, or had the financial
> resources, or whatever she needed to get away from him, maybe R.D. would still
> be alive.

Dkt. 18-18 at 9-10 [77-78].  McAmis then returned to the sibling abuse evidence and intertwined

it with the domestic abuse, arguing that Jenna tried to explain away the handprint on T.D.'s face

but ultimately testified she had to take T.D. away from Dickerson; that she should have been more suspicious of Dickerson's explanation for the bruise on K.D.'s face, "[e]specially given what has happened between her and him"; and that R.D. might still be alive "if Jenna had had the courage or the ability to at any point in time call the police [or] call DHS." *Id.* at 10-11 [78-79]. McAmis also responded to McArtor's closing remarks about sibling abuse evidence:

> You, know, Counsel in his closing characterized it as two events. Two events. That's what they want to bring to you? Well, first of all, Jenna never even told anybody those two events until the police found out from other people, and directly questioned her about it. And then she admitted it, but just barely. Some [sic] was it only two events? But even if it was only two events, T.D., K.D., and the third time's the charm; right? It's two too many. And it's three too many for R.D.

*Id.* at 11-12 [79-80]. Referring to R.D.'s rib fractures, McAmis later argued that Jenna should have known "that something was wrong with her baby" and that Jenna likely was "too worried about the other woman" and "chose not to see something that was right there in front of her eyes" because she had "spent six years making excuses for [Dickerson]." *Id.* at 17 [85].

### 4. "Shaken baby syndrome" evidence

In her final closing argument, McAmis talked about statements Dickerson made during the investigation indicating that R.D.'s eyes were "not looking right," that she was "not responding," and that "she gasped a little," then argued:

> There's a little bit of truth in what [Dickerson's] telling, because [R.D.] did experience all of those things. It's just it was after he abused her. It was after he shook her. After he abused her, after he shook her, you better believe she was gasping for air. After he abused her, after he shook her, you better believe she was losing responsiveness, losing consciousness. After he abused her, after he shook her, you better believe her eyes weren't right.

*Id.* at 7 [75]. McAmis later speculated that Dickerson must have lost his temper because R.D. was a "fussy baby," argued that only two people were in the living room, R.D. "was too young and too injured, and now dead, and so she can't talk and tell us what happened. And the Defendant, and he's not talking." *Id.* at 14-15 [82-83].

Can we tell you exactly what order it happened in? Did he hit her in the head first, and then shake her and throw her on the couch? Did he shake her and then hit her and throw her on the couch? Did he hit her, take a break, then shake her, and then throw her on the couch? I don't know the exact order that it all happened, and I'm not pretending to. But because of her injuries, we know that he used force on her, and he caused her to be so injured that she died.

*Id.* at 15-16 [83-84].

### 5.    OCCA decision

The OCCA rejected Dickerson's prosecutorial misconduct claim, stating:

[Dickerson] argues in Proposition Three that prosecutorial misconduct in questioning witnesses and closing arguments denied him a fair trial. [Dickerson] concedes that very few of the tactics challenged on appeal were met by objection. Any tactics that passed without objection are waived, and our review is for plain error.

[Dickerson] argues that the prosecutor committed flagrant misconduct in: (1) violating the trial court's order excluding evidence of marijuana possession and paraphernalia; (2) attacking the defense expert and misleading the jury regarding expert fees; and (3) emphasizing character evidence and "Shaken Baby Syndrome" evidence in argument. Viewing each of the challenged tactics within the context of the trial, we find nothing that rendered the verdicts unreliable or the trial fundamentally unfair.

Dkt. 17-1 at 7-8.

### C.    Analysis and conclusion

Dickerson contends the OCCA unreasonably applied clearly established federal law to the facts of this case because the alleged misconduct was flagrant, intentional, and unduly prejudicial given that this case involved a "battle of experts." Dkt. 10 at 58-60. Dickerson further contends the cumulative effect of the alleged misconduct "moved the needle in the State's direction," and that it was unreasonable for the OCCA to conclude otherwise. *Id.* at 58. Respondent contends that § 2254(d) bars relief. Dkt. 17 at 71-80.

Having carefully examined the record of state court proceedings, the Court finds, for several reasons, that the alleged instances of prosecutorial misconduct, whether viewed

individually or collectively, were not sufficiently egregious to deprive Dickerson of due process. The trial court found, and the record shows, that Jacoby violated a pretrial ruling by eliciting Kite's testimony that drug paraphernalia was found in Dickerson's home.  But the record also supports the trial court's reasoning that, in the context of the entire trial, the reference to drug paraphernalia was "fleeting."  The likely impact of this evidence on the jury's verdict is negligible, at best.

McAmis's conduct in eliciting testimony about Dr. Hau's fees and emphasizing this evidence during closing remarks is more concerning.  As Dickerson contends, the sole purpose of eliciting and emphasizing this evidence was to discredit Dr. Hua.  This is not an improper purpose. As Respondent contends, Oklahoma law permits a prosecutor to "comment on the relationship between an expert's fee for services and the truth of his testimony."  *Bell v. State*, 172 P.3d 622, 625 (Okla. Crim. App.  2007).  But McAmis's comments in this case exceeded that purpose.  Dr. Hua was the sole defense witness and his testimony regarding R.D.'s potentially fatal VM was critical to Dickerson's theory of defense.  Rather than relying on the strength of the testimony of the State's own medical experts and distinguishing their opinions from Dr. Hua's to help the jury fairly evaluate complicated medical evidence, McAmis urged the jury to wholly disregard Dr. Hua's testimony by misleading the jury about the fees he charged in R.D.'s case (which were clearly capped by the trial court) and suggesting that he made up reasons that might support Dickerson's defense to pad his fees before Christmas.  Under the facts of this case, McAmis's comments regarding Dr. Hua's fees were improper and unnecessary. *See DeChristoforo*, 416 U.S. at 649 (Douglas, J., dissenting) (noting that a prosecutor's "function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial").  Nonetheless, the fundamental fairness standard's concern is not the propriety of a prosecutor's remarks but the fairness of the defendant's trial.  While improper, McAmis's remarks about Dr. Hua's fees, which

were made without objection, were not sufficiently egregious to deprive Dickerson of a fair trial.

McAmis's challenged remarks about the sibling and domestic abuse evidence and the "shaken baby syndrome" evidence mainly were fair comments on the evidence. *See Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005) ("A prosecutor is allowed to comment on the evidence and draw inferences therefrom, but he may not speculate or refer to evidence never presented to the jury."). Dickerson's arguments that these comments were improper rest (1) on Dickerson's mistaken premise, argued in claim one, that the sibling and domestic abuse evidence was inadmissible, and (2) on Dickerson's mistaken assertion that there was "no medical evidence whatsoever that R.D. was shaken by anybody." Dkt. 10 at 54-57. As previously discussed, the OCCA found that the sibling and domestic abuse evidence was properly admitted under state law. And Dickerson's argument that no evidence of shaking was admitted at trial effectively ignores Dr. Baxter's testimony that the "mechanism of injury" for R.D.'s contusions, subdural hematoma, subarachnoid hemorrhage, and optic nerve sheath hemorrhage "was acceleration-deceleration injury with impacts on two different sides of her head." Dkt. 18-15 at 45-47 [795-97], 96-98 [846-48]. Even accepting that some of McAmis's comments on these categories of evidence went beyond fair comments on the evidence, the Court notes (as did the OCCA), that nearly all the challenged comments were met with no objections. While the absence of an objection does not preclude a finding that prosecutorial misconduct occurred in closing arguments, it does weigh against a finding that the unobjected to comments were egregious. In addition, the trial court instructed that it must base its verdict only on evidence presented at trial and that the attorneys' statements and arguments were made only for persuasive purposes. Dkt. 18-18 at 3, 5; Dkt. 18-36 at 15, 27. To the extent any closing remarks were improper or misleading, these instructions likely minimized their prejudicial impact.

For these reasons, the Court finds that it was objectively reasonable for the OCCA to decide that the alleged instances of prosecutorial misconduct did not so infect the trial as to deny Dickerson of due process. Because § 2254(d) bars relief, the Court denies the Petition as to claim three.

## IV.    <u>Claim four</u>:  ineffective assistance of trial counsel

Dickerson claims he was denied his Sixth Amendment right to the effective assistance of trial counsel because McArtor and Mims did not "adequately object to the admission of other crimes evidence and prosecutorial misconduct." Dkt. 10, at 60-64.[16]

### A.    Clearly established federal law

Claims of ineffective assistance of counsel are analyzed under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant must establish both deficient performance and resulting prejudice. *Id.* at 687-88. To establish deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* To establish prejudice, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

---

[16] Dickerson raised additional allegations of ineffectiveness on direct appeal, asserting that McArtor and Mims (1) failed to adequately prepare Dr. Hau for trial; (2) failed to object to the admission of improper character evidence and prosecutorial misconduct; and (3) failed to pursue and obtain tissue evidence establishing Dickerson's actual innocence—specifically, by failing to further investigate whether R.D.'s VM did, in fact, rupture. Dkt. 17-2 at 50-56; Dkt. 17-3. This third allegation was the sole basis for the evidentiary hearing held in conjunction with Dickerson's direct appeal. Dkts. 18-23, 18-24. Dickerson cited these same three allegations of ineffectiveness in his Petition. Dkt. 2 at 11. However, in his Brief in Support, Dickerson notes, without explanation, that he raises "only portions of the ineffective assistance of trial counsel claim raised on direct appeal." Dkt. 10 at 60 n.20. Respondent acknowledges that Dickerson's brief narrowed claim four and presumes that Dickerson, who is represented by counsel, has abandoned the other allegations that were raised on direct appeal. Dkt. 17 at 80 n.15. Given Dickerson's note that he narrowed claim four, Respondent's acknowledgement of the same, and the absence of any further explanation from Dickerson's Reply, *see* Dkt. 22, the Court considers claim four as including only the allegations of ineffectiveness that are identified in Dickerson's Brief.

*Id.* at 694.  When, however, a petitioner seeks habeas relief on a claim of ineffective assistance of counsel under § 2254(d), "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Id.* (citations omitted).

### B.    OCCA decision

Applying *Strickland*'s two-part inquiry, the OCCA determined that Dickerson did not demonstrate deficient performance or resulting prejudice.  Dkt. 17-1 at 11-16.  Relevant to the narrower *Strickland* claim Dickerson now presents in claim four, the OCCA reasoned:

> Having reviewed both [the allegation that trial counsel should have developed and used recut tissue evidence that was developed on direct appeal] and [Dickerson's] remaining allegations concerning trial counsel's alleged failure to better prepare the expert, and to object to evidence and alleged misconduct, [Dickerson] has not shown that his trial counsel were constitutionally ineffective under the standard set forth in *Strickland*.

*Id.* at 11-15.

### C.    Analysis and conclusion

Dickerson contends the OCCA's rejection of his ineffective assistance of trial counsel claim involves an unreasonable application of *Strickland* and is based on an unreasonable determination of the facts.  Dkt. 10 at 62.  The Court disagrees on both points.  First, Dickerson does not identify any specific facts that the OCCA either misstated or misapprehended in adjudicating his claim.  The relevant facts are clear from the record.  Trial counsel fought hard before trial to have extensive other crimes evidence excluded and achieved some success; trial counsel contemporaneously objected when some, but not all, other crimes evidence was admitted at trial; and trial counsel objected to some, but not all, instances of alleged prosecutorial

misconduct that Dickerson identified on direct appeal.  The OCCA discussed these facts when it adjudicated Dickerson's substantive claims challenging the admission of other crimes evidence and alleging prosecutorial misconduct.  Nothing in the OCCA's decision or in Dickerson's Brief in Support suggests that the OCCA misunderstood the facts relevant to this portion of his *Strickland* claim.

Second, Dickerson has not shown that the OCCA's decision unreasonably applied *Strickland* to the facts of his case.   Even accepting Dickerson's position that McArtor and Mims performed deficiently by failing to object, at trial, to the admission of sibling abuse evidence and by failing to object to certain instances of alleged prosecutorial misconduct, it was objectively reasonable for the OCCA to find no resulting prejudice.  As previously discussed, the OCCA determined that the sibling abuse evidence was admissible.  There is no reasonable probability that, but for the failure to object to this evidence, the result of the trial would have been different. Similarly, the OCCA concluded that the alleged prosecutorial misconduct did not deprive Dickerson of due process.  There is no reasonable probability that, but for the failure to object to the alleged instances of misconduct, the result of the trial would have been different.

Because Dickerson has not shown that the OCCA had no reasonable basis to deny his ineffective assistance of trial counsel claim, § 2254(d) bars relief.  The Court therefore denies the Petition as to claim four.

## V.    <u>Claim five</u>:  ineffective assistance of appellate counsel

Dickerson claims his appellate counsel, Kolar, provided constitutionally deficient representation by "failing to raise a claim alleging trial counsel ineffectiveness for failing to investigate and retain an appropriate expert to investigate for other potential natural causes of death."  Dkt. 2, at 17; Dkt. 10, at 64-76; Dkt. 22 at 13-21. More specifically, Dickerson claims

Kolar should have investigated "other potential natural causes of death, apart from a brain bleed," because that investigation "would have yielded an expert such as Dr. Auer, who would have established R.D. died from the natural cause of interstitial pneumonia" and Kolar then could have argued that McArtor and Mims were ineffective for failing to investigate non-brain-based causes of death.  Dkt. 22 at 14.

### A.   Clearly established federal law

*Strickland*'s two-part inquiry also applies to claims alleging ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000).  In this context, the inquiry focuses on whether the appellant has shown "that a particular nonfrivolous issue" appellate counsel omitted from the appeal "was clearly stronger than issues that counsel did present."  *Id.* at 288.  An "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Id.* (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).  And, even if an appellant establishes that appellate counsel performed deficiently, the appellant must show resulting prejudice, i.e., "a reasonable probability that," but for appellate counsel's deficient performance, the appellant "would have prevailed on his appeal."  *Robbins*, 528 U.S. at 285-86.  "When . . . the basis for the ineffective assistance claim is the failure to raise an issue, [the reviewing court] must look to the merits of the omitted issue."  *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006). "If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance."  *Id.*

### B.   OCCA decision

The OCCA concluded that Dickerson properly raised his ineffective assistance of appellate counsel claim through his application for postconviction relief.  Dkt. 17-10, at 3.   The OCCA

identified that claim as arguing "that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for failing to obtain an 'appropriate' medical expert to evaluate other natural causes of R.D.'s death." *Id.* at 4. Applying *Strickland* and considering the merits of the underlying claim that Dickerson identified as wrongly omitted by appellate counsel, the OCCA rejected Dickerson's claim. The OCCA reasoned:

> "[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to counsel the power to make binding decisions of trial strategy in many areas." *Faretta v. California*, 422 U.S. 806, 820 (1975). Again, we indulge a strong presumption of counsel's reasonable professional performance. Such a presumption is primarily due "to the many strategic choices counsel must make in any given case. So long as the choices are informed ones, counsel's decision to pursue one strategy over others is 'virtually unchallengeable.'" *Jones v. State*, 2006 OK CR 5, ¶ 78, 128 P.3d 521, 545 (quoting *Strickland*, 466 U.S. at 690-91). "Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily be the basis for ineffective assistance." *Phillips v. State*, 1999 OK CR 38, ¶ 128, 989 P.2d 1017, 1048.
>
> We note at the outset that this is [Dickerson's] third attempt to present a medical expert to rebut the State's experts' conclusion that R.D. died as a result of multiple blunt force trauma. At trial, trial counsel presented the testimony of a neuropathologist, Dr. Hua, who identified evidence of a vascular malformation in R.D.'s brainstem, which he opined could have spontaneously ruptured and manifested as a subdural hematoma and subarachnoid hemorrhage. Next, at a remanded evidentiary hearing during the direct appeal proceedings, appellate counsel presented the testimony of Dr. Shuman a forensic pathologist, who testified he had confirmed that a vascular malformation in R.D.'s brain had ruptured and that she died of natural causes.
>
> At the post-conviction evidentiary hearing, [Dickerson] presented the testimony and report of a different neuropathologist, Dr. Roland Auer, to support his claim that appellate and trial counsel were ineffective for failing to obtain a medical expert to explore other potential natural causes of R.D.'s death. Upon review of R.D.'s medical records, the medical examiner's autopsy report and photographs, and microscopic examination of several slides prepared from tissue and cell cuttings collected at the time of R.D.'s autopsy, Dr. Auer concluded that R.D. died from interstitial pneumonia.
>
> Dr. Auer agreed with the previous experts that R.D. had a subdural hematoma on both sides of her brain, a subarachnoid hemorrhage, bruising on her scalp, bruising on her occipital bone in two different locations, hemorrhaging on her left optic nerve, hemorrhaging in her thoracic spine, and two healing posterior rib fractures. He opined that R.D.'s rib fractures were a result of vitamin D

deficiency caused by indoor living and bone growth, and that the bruises on her
scalp and occipital bone were caused by intubation and firm handling by medical
personnel. In Dr. Auer's opinion, R.D. went into cardiorespiratory arrest due to
pneumonia, which led to "non-perfused brain," or brain death. He believed that
when medical personnel administered epinephrine to restart her heart, the
restoration of blood flow, or reperfusion, could not circulate into the non-perfused
brain and instead went around it into the scalp, eyes, nose, and dura, which was
misinterpreted as head trauma.

Dr. Auer further testified that every doctor who saw R.D. in the hospital,
the medical examiner who conducted her autopsy, the defense expert who reviewed
R.D.'s case for trial, as well as the defense expert who reviewed her case for direct
appeal, were all wrong and misdiagnosed her. He attributed the diagnosis of
abusive head trauma to "group thinking or bandwagon thinking," and espoused the
belief that there is "an epidemic in this country of doctors providing false
diagnoses[.]" Dr. Auer acknowledged that he had no training in pediatrics or in the
field of child abuse.

Reviewing Dr. Auer's testimony in light of both the trial and direct appeal
record, the district court found [Dickerson] had failed to establish that appellate
counsel provided deficient performance. As noted above, [Dickerson] raised a
substantially similar claim of ineffective assistance of trial counsel on direct appeal,
arguing that trial counsel was ineffective for, among other things, failing to
investigate and utilize tissue evidence indicating an alternative cause of death. The
district court noted that appellate counsel had successfully secured a remanded
evidentiary hearing on that issue, at which [Dickerson] presented the testimony of
a different pathologist who attributed R.D.'s fatal brain bleeding to natural causes.

Oklahoma's Post-Conviction Procedure Act is not intended to provide a
second appeal. *Bosse v. State*, 2021 OK CR 30, ¶ 4, 499 P.3d 771, 773. Nor is it
an opportunity for those convicted of a crime to test new defenses in hopes one will
eventually succeed. [Dickerson] has failed to demonstrate that trial counsel's
strategic decision to pursue a defense that aligned with the medical evidence, was
supported by expert testimony, and offered a non-abusive causation theory for
R.D.'s fatal brain injury was objectively unreasonable. [Dickerson] has also not
established prejudice from counsel's strategic decisions. As the district court
observed, "The issues of timing of what came first—the lack of breathing or the
brain bleed—has been presented to the jury and litigated." The jury rejected the
reperfusion theory. [Dickerson] has failed to show a reasonable probability that the
outcome of his trial would have been different had trial counsel pursued a different
tactic, particularly one that so brazenly discounts all other medical opinions. Upon
thorough review of the record, we find trial counsel rendered constitutionally
effective legal assistance. [Dickerson's] claim to the contrary is meritless.

Likewise, [Dickerson] has not demonstrated ineffectiveness of appellate
counsel. "Failure to press meritless claims do[es] not constitute ineffective
assistance of counsel." *Hatch v. State*, 1983 OK CR 47, ¶ 9, 662 P.2d 1377, 1381;

> *see also Logan*, 2013 OK CR 2, ¶ 11, 293 P.3d at 975 ("The omission of a meritless
> claim, *i.e.*, a claim that was destined to lose, cannot constitute deficient
> performance; nor can it have been prejudicial."). Thus, the district court's denial
> of this claim was neither clearly erroneous nor clearly against the logic and effect
> of the facts presented.

Dkt. 17-10, at 4-9.

### C.    Analysis and conclusion

Dickerson contends, for three reasons, that the OCCA unreasonably applied *Strickland* to

the facts of his case and/or based its decision on an unreasonable determination of the facts for

three reasons  Dkt. 10 at 66.  First, Dickerson claims the OCCA made an unreasonable

determination of the facts when it noted that Kolar raised a "substantially similar" allegation on

direct appeal challenging McArtor and Mims failure to further investigate whether R.D.'s VM did,

in fact, rupture.  *Id.* at 66-70.  Second, Dickerson claims the OCCA made an unreasonable

determination of fact by "labeling trial counsel's deficient performance as strategy" because (1)

R.D.'s autopsy report alerted McArtor and Mims to potential respiratory illness and their affidavits

show that they stopped investigating other natural causes of death after Dr. Hua discovered the

potentially fatal VM; and (2) Kolar's affidavit likewise shows that Kolar's "limited investigation

to brain-bleed causes of death was not the product of strategy or reasoned investigation."  *Id.* at

70-72.  Third, Dickerson claims "the OCCA's finding of no prejudice is unreasonable as to law

and fact" because it is based on the OCCA's "objectively unreasonable" finding that "Dr. Auer

simply called the other medical professionals wrong or brazenly discounted their opinions in

arriving at his."  *Id.* at 73-74.

Respondent contends, and the Court finds, that § 2254(d) bars relief as to claim five

because the OCCA reasonably applied *Strickland* to the facts of this case and reasonably

determined the facts presented in state court that are relevant to Dickerson's claim.  First, while

the OCCA described Dickerson's claim as "substantially similar" to the claim he raised on direct

appeal, the OCCA clearly understood the new allegation of trial counsel ineffectiveness was different. The OCCA identified the direct appeal claim as "arguing that trial counsel was ineffective for, among other things, failing to investigate and utilize tissue evidence indicating an alternative cause of death." Dkt. 17-10 at 7. The OCCA identified the postconviction claim as arguing "that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for failing to obtain an 'appropriate' medical expert to evaluate other natural causes of R.D.'s death." *Id.* at 4. And the OCCA's analysis of that claim makes clear that the OCCA understood Dickerson's argument to be that Dr. Auer was the "appropriate" expert to evaluate pneumonia as a potential natural cause of death. *Id.* at 4-9. Dickerson's argument that the OCCA misunderstood or misdescribed his postconviction claim lacks merit.

Second, the OCCA did not merely "label" the actions of Dickerson's trial and appellate attorneys as "strategic decisions." *Strickland* establishes, among other things, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 690-91. The OCCA thoroughly explained why, under the circumstances of R.D.'s case, it was "objectively reasonable" for McArtor and Mims to make a "strategic decision to pursue a defense that aligned with the medical evidence, was supported by expert testimony, and offered a non-abusive causation theory for R.D.'s fatal brain injury." Dkt. 17-10 at 8. And, as Respondent contends, it was reasonable for Dickerson's trial attorneys to rely on Dr. Hua, and for Kolar to rely on Dr. Shuman, "to understand what the findings in the in the records meant, report weaknesses in the State's medical conclusions and theory, and identify potentially exculpatory aspect of the medical evidence." Dkt. 17 at 102; *see, e.g.*, *Lesko v. Sec'y*

*Pa. Dep't of Corr.*, 34 F.4th 211, 243 (3d Cir. 2022) ("There is no question that lawyers can and
often do reasonably rely on experts, especially in navigating a field in which they have no
training."); *Wilson v. Sirmons*, 536 F.3d 1064, 1133 (10th Cir. 2008) (Tymkovich, C.J., concurring
in part and dissenting in part) (indicating that, in determining what would lead a reasonable
attorney to order additional testing, "we may expect counsel to rely on the opinion of a[n] expert").
That Dr. Hua and Dr. Shuman each evaluated R.D.'s autopsy report and other medical records and
neither suggested interstitial pneumonia as a viable alternative cause of death weighs against a
finding that McArtor, Mims, and Kolar performed below prevailing professional norms for failing
to further investigate that potential cause of death.

Third, the OCCA identified in its analysis the reasons supporting its determination that Dr.
Auer "brazenly discounts all other medical opinions," and the Court finds no good reason to repeat
those reasons here. *See* Dkt. 17-10 at 4-9. Neither that determination, nor the OCCA's conclusion
that Dickerson did not demonstrate *Strickland* prejudice as to the underlying ineffective assistance
of trial counsel claim is objectively unreasonable.

Fourth, as the OCCA reasoned, without a showing that the underlying allegation of trial
counsel ineffectiveness had merit, Dickerson further failed to show that appellate counsel provided
constitutionally deficient representation by omitting that claim. *Wood v. Carpenter*, 907 F.3d
1279, 1304 (10th Cir. 2018) (concluding appellate counsel "did not perform ineffectively by failing
to raise [a] non-meritorious claim"). It was therefore objectively reasonable for the OCCA to deny
the ineffective assistance of appellate counsel claim.

For these reasons, § 2254(d) bars relief and the Court denies the Petition as to claim five.

## VI.    <u>Claim six:</u> *Brady/Giglio* violation based on non-disclosure of civil judgment

Dickerson claims the State violated his Fourteenth Amendment right to due process, as that

right is interpreted in *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to disclose

the existence of a 2017 civil judgment that was entered against Detective Danielle Bishop, the lead

detective who investigated R.D.'s death. Dkt. 2, at 18-19; Dkt. 10, at 76-81.

### A.    Clearly established federal law

*Brady* "requires the State to disclose material exculpatory and impeachment evidence

regardless of whether a motion compelling such disclosure is filed or granted" and obligates the

government "to disclose favorable evidence when it reaches the point of materiality, regardless of

the defense's subjective or objective knowledge of such evidence." *Fontenot*, 4 F.4th at 1064,

1066. "To prevail on a *Brady* claim, the proponent must show that '(1) the prosecution suppressed

evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'"

*Goode*, 922 F.3d at 1149. "[E]vidence is 'material' within the meaning of *Brady* when there is a

reasonable probability that, had the evidence been disclosed, the result of the proceeding would

have been different." *Cone*, 556 U.S. at 469-70.

### B.    OCCA decision

Dickerson first presented this claim to the OCCA through his postconviction appeal. The

OCCA agreed with the state district court that Dickerson waived this claim because he did not

raise it on direct appeal. Dkt. 17-10, at 2-3. The OCCA stated:

> [Dickerson] has failed to demonstrate sufficient reason for failing to raise a claim
> on direct appeal that the State failed to disclose certain impeachment evidence
> against Detective Bishop, a non-testifying witness in this matter. This proposition,
> which is based on information relating to a 2017 civil judgment against the City of
> Tulsa, is waived. *See Slaughter v. State*, 1998 OK CR 63, ¶ 9, 969 P.2d 990, 994
> ("The facts generating the present [*Brady*] claim either were or could have been
> discovered by appellate counsel with the exercise of due diligence and could have
> been raised on direct appeal. The failure to do so waives further consideration of
> the issue.").

*Id.* at 3.

### C.    Analysis and conclusion

Respondent contends claim six is procedurally defaulted because the OCCA denied relief on an independent and adequate state law ground, namely, the OCCA's well-established rule that claims that could have been raised on direct appeal are waived if they are not so raised. Dkt. 17 at 109-11. Dickerson argues this state procedural rule is inadequate to preclude federal habeas review but does not explain why the rule is inadequate. Dkt. 10 at 78. Respondent has the better argument. A state procedural rule is adequate if it is firmly established and regularly followed. *Beard v. Kindler*, 558 U.S. 53, 60 (2009). Oklahoma's rule barring postconviction review of claims that could have been raised on direct appeal is adequate, even when applied to a *Brady* claim. *See Hale*, 227 F.3d at 1330 & n.15 (reiterating prior holding "that Oklahoma's bar on raising claims on post-conviction that could have been raised on direct appeal is an independent and adequate state bar with regard to *Brady* claims" and stating, "we again conclude that [Okla. Stat. tit. 22, §] 1086 is an adequate state bar to *Brady* claims raised on post-conviction review that could have been raised on direct appeal"). Dickerson does not argue, and thus has not shown, that he can overcome the procedural default of this claim. Dkt. 10 at 76-81; Dkt. 22. The Court therefore denies the Petition as to claim six because that claim is procedurally barred.

## VII.    Claim seven:  cumulative error

Dickerson claims that the cumulative effect of all errors he identified in his direct appeal and all errors he identified in his application for postconviction relief deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments. Dkt. 2, at 20; Dkt. 10, at 81-84.

### A.    Clearly established federal law

"[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the

right to a fair trial and due process.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 n. 16 (10th Cir. 2015)

(quoting *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003)).  "A cumulative-error analysis

aggregates all errors found to be harmless and analyzes whether their cumulative effect on the

outcome of the trial is such that collectively they can no longer be determined to be harmless."

*Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016) (quoting *Cargle v. Mullin*, 317 F.3d

1196, 1206 (10th Cir. 2003)). This "analysis applies where there are two or more actual errors.  It

does not apply, however, to the cumulative effect of non-errors."  *United States v. Franklin-El*,

555 F.3d 1115, 1128 (10th Cir. 2009).  "In the federal habeas context, the only otherwise harmless

errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit

relief under cumulative error doctrine 'only when the constitutional errors committed in the state

court trial so fatally infected the trial that they violated the trial's fundamental fairness.'" *Matthews

v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) (citation omitted).

### B.   Additional facts and OCCA decision

Dickerson raised a cumulative-error claim on direct appeal, asserting that the combined

effect of the trial errors he identified on direct appeal deprived him of a fair trial.  Dkt. 17-2 at 56.

The OCCA succinctly rejected this claim, stating, "[t]he Court finds no individual errors, and no

accumulation of prejudice from individually harmless errors."  Dkt. 17-1 at 15.

Dickerson raised a different cumulative-error claim on postconviction appeal, asserting

that "trial and appellate errors, when considered in a cumulative fashion, warrant a new trial."  Dkt.

17-9 at 35.  Citing state and federal law, Dickerson asked the OCCA "to evaluate all the errors

raised on direct appeal and in [his] post-conviction application for their cumulative impact on his

conviction and sentence."  *Id.*  The OCCA agreed with the state district court that this cumulative-

error claim was "procedurally barred" under the doctrine of *res judicata*, because it was "raised

and litigated on direct appeal." Dkt. 17-10, at 2-3. The OCCA further stated, "to the extent the claims raised on post-conviction may differ from those raised on direct appeal, they are waived." *Id.* at 3.

    **C.    Analysis and conclusion**

    The parties disagree on whether claim seven is properly before this Court. Dkt. 10 at 81-82; Dkt. 17 at 116-17. To the extent any procedural bars may preclude relief on this claim, the Court exercises its discretion to overlook them because Dickerson has not identified any constitutional errors for this Court to aggregate. The Court therefore denies the Petition as to claim seven.

*CONCLUSION*

    Based on the foregoing analysis, the Court concludes that Dickerson has not shown that federal habeas relief is warranted. The Court thus denies the Petition as to all claims raised therein. The Court finds that Dickerson has not made a substantial showing of the denial of a constitutional right and thus declines to issue a certificate of appealability. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

    **IT IS THEREFORE ORDERED** that:

    1.  the Clerk of Court shall note on the record the substitution of Michael Miller in place of Mark Bowen as party respondent;

    2.  the Petition (Dkt. 2) is **denied**;

    3.  a certificate of appealability is **denied**; and

    4.  a separate judgment shall be entered herewith.

    **DATED** this 24th day of March, 2025.

                                        GREGORY K. FRIZZELL
                                        UNITED STATES DISTRICT JUDGE